UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X          Case No. 17-cv-6518
EMILIO GONZALEZ,

                                           Plaintiff

                                                                                JURY TRIAL
                                                                                DEMANDED
-against-




THE CITY OF NEW YORK, SEUNGHWAN KIM,
JAMES COX, KATHERINE REILLY, and MARIA
MAGLIO-SCOTTI, in their respective personal and
Official capacities,
                                           Defendants          **FOURTH**
------------------------------------------------------------------- X          **AMENDED COMPLAINT**

        Plaintiff, EMILIO GONZALEZ, by his attorneys, LAW OFFICES OF K.C. OKOLI,

P.C., complaining of the defendants, alleges as follows:

                              JURISDICTION AND VENUE

1.   This is an action for money damages and injunction. This action arises under 42 U.S.C.

     §1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1983, New York City

     Human Rights Law ("NYCHRL"), §8-107 et seq., the United States Constitution, the

     New York State Constitution.

2.   Venue is proper in this district based upon the fact that the events or omissions which

     give rise to the claims asserted herein occurred within the Southern District of New

     York.

3.   This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

4.  This Court has supplemental jurisdiction over the causes of action asserted in this action under the local laws of the City and State of New York.

5.  At all times relevant to this action, each defendant named herein was acting under color of the statutes, ordinances, regulations, customs and usages of the United States, the State of New York, the City of New York, under local law and regulation and under the authority of their respective statuses, positions and/or offices.

6.  At all times relevant to this action, the Defendants aided and abetted the discriminatory adverse employment actions of each other taken against GONZALEZ.

7.  Plaintiff brings these claims against the individual defendants in both their individual and official capacities.

8.  Plaintiff brings these claims against the individual defendants in both their individual and official capacities.

9.  Defendant CITY is responsible for the State Law Claims made against each individual defendant in this action on the principle of respondeat superior.

10.  On November 7, 2016, plaintiff filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §§ 2000e *et. seq.*

11.  On August 25, 2017 the EEOC issued plaintiff a "Right to Sue" letter.

<u>PARTIES</u>

12.  Plaintiff, EMILIO GONZALEZ ("GONZALEZ") is a fifty-two (52) year-old Latino-American Male of Puerto Rican descent, residing in the City and State of New York.

13.  GONZALEZ graduated with a Bachelor of Science degree in Criminal Justice from John Jay College of Criminal Justice in June 1989.

2

14. In June 1993, GONZALEZ obtained a Juris Doctor degree from Seton Hall University School of Law.

15. Defendant, THE CITY OF NEW YORK ("CITY") is a municipality organized and existing under and by virtue of the laws of the State of New York, and the former employer of GONZALEZ.

16. Defendant SEUNGHWAN KIM ("KIM"), at all times relevant to this action, was the Deputy Comptroller for the Bureau of Law and Adjustment ("BLA"), a bureau within the Office of the New York City Comptroller (Comptroller's Office"), and is among other things, a male in his 40's of Asian descent, with supervisory authority over GONZALEZ.

17. Defendant JAMES COX ("COX"), at all times relevant to this action, was the Director of Settlements and Adjudications, a unit of BLA, and among other things, a White male with supervisory authority over GONZALEZ.

18. Defendant KATHERINE REILLY ("REILLY"), at all times relevant to this action, was Deputy Director of Settlements and Adjudications, and among other things, a White female with supervisory authority over GONZALEZ.

19. Defendant MARIA MAGLIO-SCOTTI ("MAGLIO-SCOTTI"), at all times relevant to this action, was Chief of the Motor Vehicles ("M/V") team, a unit of BLA, and among other things, a White female with supervisory authority over GONZALEZ.

<u>RELEVANT FACTS COMMON TO ALL CLAIMS</u>

20. The New York City Comptroller's Office is an administrative unit of and within the government of defendant CITY.

21.     At all times relevant to this action Scott M. Stringer was the New York City Comptroller ('Comptroller"), the principal person in charge of the Comptroller's Office.

22.     BLA settles and adjusts claims and lawsuits filed for and against defendant CITY.

23.     BLA is comprised of several units or divisions including the Personal Injury division ("PI") which is one of the largest units of BLA, the members of which regularly received merit raises and promotions.

24.     The Personal Injury division is comprised of "Teams" of Claim Examiners.

25.     Each Team was managed by a designated "Chief".

26.     Each Chief reported directly to either: **a)** The Director of Torts, Michael Aaronson and when Aaronson retired, to Adam S. Karp ("Karp"), who subsequently became the Director of Torts, and/or; **b)** Defendant KIM, and/or; **c)** To defendant REILLY.

27.     The Motor Vehicles Team ("MV") is part of BLA and adjusts claims and lawsuits involving the personal injury component of motor vehicle related collisions.

28.     The Settlements and Adjudications unit ("S&A") is part of BLA and adjusts claims and lawsuits regarding real property taxation, lost wages, affirmative actions by defendant CITY, equitable claims and Eminent Domain matters, among others.

29.     The Board of Education/Department of Education team ("DOE") is part BLA and adjusts claims and lawsuits involving the Board of Education/Department of Education, an agency of CITY.

30.     The Comptroller Court Representatives ("Court Reps") were members of the "Litigation Division" ("LD"), a division that formed part of BLA.

31.     Members of LD did not engage in the practice of law, despite its name, therefore no New York State Bar admission was required for members to carry on their job duties.

4

32.     At all times relevant to this action, no one in BLA engaged in the practice of law such that anyone needed to be admitted to the New York State Bar.

33.     The Court Reps reported directly to the Director of LD, to GONZALEZ, when GONZALEZ was the Senior Court Rep, and to defendant KIM.

34.     Defendant KIM had supervisory authority over all employees of BLA and all units, divisions and teams, including PD, DOE, MV, S & A and LD and the Court Reps.

35.     As the individual in charge of BLA, KIM had policy making and decision-making authority because KIM set the standards and procedures for how high profile and high exposure claims and lawsuits in BLA were managed and who from BLA would handle and negotiate them; KIM led and controlled BLA operations.

36.     KIM approved and/or disapproved requests for office supplies and office furniture and office re-configurations; KIM also decided which job applicant would be hired in BLA, which BLA employee would be promoted and which BLA employee would be demoted. KIM also decided which BLA employee would be brought up on charges before OATH and/or terminated.

37.     Defendant REILLY was not the "official" or "titled" person that oversaw the BLA units, divisions and/or teams; defendant REILLY had influence over defendant KIM, that defendant KIM relied on defendant REILLY for managing the units, divisions and/or teams, that defendant REILLY led meetings with the Chiefs of the units, divisions and teams, and that defendant REILLY acted as a person in charge of BLA.

38.     Defendant REILLY had supervisory authority over all employees of BLA and all units, divisions and teams including PD, DOE, MV, S&A and LD and the Court Reps.

39.     As a de-facto person in charge of BLA and as Deputy Director of Settlements and

Adjudications, defendant REILLY had policy and decision-making authority in BLA.

40.     As Deputy Director of Settlements and Adjudications, defendant REILLY made

decisions over the assignment of claims and lawsuits in BLA and even had the authority to

settle the claims of her former and retired supervisors and colleagues even though doing so

was prohibited in BLA and constituted a conflict of interest prohibited by the Conflicts of

Interest Rules of the City of New York.

41.     Defendant COX had supervisory authority over all employees including the Real

Property division the Law division, PD and the S&A. COX regularly interviewed candidates

that applied for jobs in BLA and set policies and procedures for handling the high profile

cases in his divisions and decided who he would assign them to for negotiation.  COX had

also directed GONZALEZ to settle cases without regard to liability on his directive and

authority.

42.     At all times relevant to this action, GONZALEZ was an employee of defendant CITY

hired in 2002 by CITY in the Capacity of Comptroller Court Representative ("Court Rep") in

the Bureau of Law and Adjustment ("BLA") where he served for over fifteen (15) years.

43.     As an employee of CITY, GONZALEZ was a public servant from December 2, 2002

to April 30, 2018, the date plaintiff's employment was terminated by CITY.

44.     At all times relevant to this action, GONZALEZ enjoyed Civil Service status as an

employee of defendant CITY.

45.     As an employee of defendant CITY, GONZALEZ was **not** responsible for

investigating, detecting, monitoring or addressing or otherwise reporting acts of government

corruption or acts of official misconduct or violations of law, mismanagement of public

funds, waste or any other conduct GONZALEZ reasonably believed would constitute a violation of law.

46.    On or about December 2, 2002, GONZALEZ began working with defendant CITY in the Comptroller's Office in the Bureau of Law and Adjustment in the capacity of Comptroller Court Representative.

47.    As a condition of maintaining, continuing and/or commencing employment with CITY, GONZALEZ was required to undergo and did undergo a background investigation conducted by the New York City Department of Investigations ("NYCDOI").

48.    At the conclusion of the background investigation, the NYCDOI sent a report containing the findings of said background investigation to William C. Thompson, Jr., the New York City Comptroller at the time.

49.    After receiving said report, defendant CITY, former Comptroller William C. Thompson, Jr. ("THOMPSON") and the COMPTROLLER'S OFFICE and its employees ratified the employment of GONZALEZ with defendant CITY, and since 2002 through the next fifteen (15) years GONZALEZ continued his responsibilities as an employee of defendant CITY, and public servant.

50.    On or about July 15, 2003, GONZALEZ was delegated "… the power to act for the Comptroller in the settlement of all tort claims and actions and proceedings in the various courts in an amount not to exceed $25,000.00", by defendant CITY and by THOMPSON.

51.    On or about February 15, 2007, defendant CITY and Comptroller THOMPSON increased the monetary settlement authority for GONZALEZ by delegating to him "… the power to act for the Comptroller in the settlement of all tort claims, actions and proceedings in the various courts in an amount not to exceed $100,000.00".

7

52.     On or about March 1, 2011, defendant CITY and former Deputy Comptroller for legal Affairs and General Counsel to former New York City Comptroller John C. Liu, increased the monetary settlement authority for GONZALEZ by delegating to him "… the power to act for the Comptroller in the settlement of all tort claims and proceedings in the various courts in an amount not to exceed $250,000.00".

53.     As GONZALEZ gained experience, he was assigned higher exposure, more complex and class action cases, which he successfully negotiated in partnership with members of the New York City Corporation Counsel, with Justices of the various Courts and members of the Bar, saving taxpayers hundreds of thousands of dollars.

54.     On April 11, 2011, after nine (9) years of serving as a Court Rep, GONZALEZ was ascended to a leadership position when he was promoted to Senior Court Representative by defendant CITY and the administration of former New York City Comptroller John C. Liu.

55.     In his capacity as Senior Court Representative, GONZALEZ was responsible for:

**a)** Supervising the Court Reps assigned to negotiate settlements in the New York State Supreme Courts for the Counties of New York, Richmond, Bronx, Queens and Kings and in the United States District Courts for the Southern and Eastern Districts of New York and for the District of New Jersey;

**b)** Training Court Reps, BLA Claims Examiners and the BLA unit Chiefs of PD, MV, DOE, from S&A and from other BLA divisions or units in the subjects of legal analysis, conducting investigations, examining damage estimates, analysing MV claims, and on negotiations;

**c)** Negotiating cases that exposed defendant CITY and/or its agencies to financial risk in the six to eight (6-8) figure ranges;

8

**d)** Negotiating cases that had political and/or governmental policy implications;

**e)** Attending meetings with Administrative Judges of the Courts for discussions on streamlining negotiations and the reduction of Court Dockets, among other matters;

**f)** Supervising the daily activities, assignments, logistics, Court part coverage performance and compliance with office protocols of the LD team;

**g)** Suggesting risk reduction strategies to agencies of defendant CITY;

**h)** Editing the memoranda prepared by every Court Rep that was used to obtain levels of settlement authority for cases that exceeded their respective levels of settlement authority;

**i)** Facilitation of and participating in the first meeting between defendant CITY, the COMPTROLLER'S OFFICE and the Federal Court Justices for the Southern District of New York;

**j)** Being the first member of the COMPTROLLER'S OFFICE to negotiate wrongful incarceration cases in the New York State Court of Claims to minimize the impact on the New York State Court claims against defendant CITY;

**k)** Completing "special projects" as assigned by the Comptroller;

**l)** Reviewing and evaluating contracts and requests for settlement authority between defendant City and private vendors such as Verizon and Telesector Resources Group, Inc. for the CITY's Public Safety Answering Center (PSAC) for the delivery VESTA, a 911 call handling software program, valued in excess of 140 million;

**m)** Reviewing Memoranda of Agreements between defendant CITY and the New York City Housing Authority, and; Memoranda of Understandings between COMPTROLLER and Corp Counsel;

9

**n)** Representing former Comptroller John C. Liu at Bar association events and issuing Commendation awards to Family Court and State Supreme Court Justices on behalf of the COMPTROLLER'S OFFICE.

56. Court Reps usually travelled from the Comptroller's Office to the Courts, from the Courts to meetings, to CLE's, to the New York City Law Department offices and back to the Comptroller's Office and then to Court or to their respective homes. This routine existed on an almost daily basis and most of the time was spent in court negotiating settlements, or in meetings with very limited office hours.

57. On or about early February 2012, GONZALEZ was selected to participate in a selective leadership program sponsored by the Comptroller's Office and eCornell, of Cornell University, which he successfully completed and received a Certificate.

58. Prior to his employment at Comptroller's Office, GONZALEZ had worked as an Assistant District Attorney for the Kings County District Attorney's Office from 1993 to 1996 where he began his public service career.

59. GONZALEZ has achieved a long and distinguished career with defendant CITY, earning outstanding performance reviews, receiving several promotions and serving at each level in various positions of leadership, with increasing responsibilities and increasing levels of settlement authority where he faithfully and effectively discharged his duties on behalf of defendant CITY and its taxpayers.

60. On or about August 12, 2014, defendant REILLY started working for defendant CITY as a Court Rep in BLA where she was subordinate to GONZALEZ;

61.     Defendant REILLY was hired at a substantially higher salary than any of the other Court Reps including GONZALEZ and was given the same title as GONZALEZ, Senior Court Rep even though she supervised no one.

62.     For the one (1) year and one (1) month defendant REILLY was a Senior Court Rep, defendant REILLY did not have any supervisory authority over any of the Court Reps or over any one else in BLA.

63.     GONZALEZ regularly assigned REILLY Memoranda of Law to write requesting settlement authority.

64.     On or before December 2014, GONZALEZ was invited by John Graham ("GRAHAM"), the former director of Settlements and Adjudications to lead PD because the Chief of PD was retiring by the end of December 2014.

65.     On February 26, 2015, BLA announced that GONZALEZ was selected Chief of PD.

66.     On February 26, 2015, GONZALEZ was summoned to the Office of defendant KIM, where GONZALEZ and KIM met and were the only two individuals present.

67.     During said meeting, defendant KIM specifically told GONZALEZ:

   **a)** To get the PD people in order, and;

   **b)** To keep in mind that the COMPTROLLER goes to "town hall community meetings" where the COMPTROLLER promises to help people, and;

   **c)** That "PD [was] the face of the COMPTROLLER", and;

   **d)** That each PD claimant was a potential voter for the COMPTROLLER;

   **e)** To fire the "Black Guy" in PD "because he was making more money than any of his colleagues in PD" and because he was "black". Defendant KIM was referring to Mr. Luc R. Pierre, an African American male over the age of 50.

68.     GONZALEZ asked KIM whether he wanted Mr. Pierre terminated because he is Black, and KIM replied "Yes."

69.     As Division Chief, GONZALEZ evaluated and observed the work ethic of Luc R. Pierre and did not find anything that warranted Mr. Pierre's termination.

70.     GONZALEZ refused to terminate Mr. Pierre as KIM had directed him to because GONZALEZ felt it would be wrong to terminate Mr. Pierre simply because he is "Black" and was making more money than his colleagues.

71.     During a subsequent meeting in early March 2015 with GRAHAM, GRAHAM informed GONZALEZ that his new responsibilities as Chief of PD included:

> **a)** Leading the PD unit;
>
> **b)** Creating policies and procedures to handle claims uniformly;
>
> **c)** Creating policies and procedures to manage the PD staff;
>
> **d)** Training the PD Claim Examiners on legal principals applicable to PD claims;
>
> **e)** Making sure PD Claim Examiners properly investigated, evaluated and when appropriate, adjust PD claims, and;
>
> **f)** Ensuring Claim Examiners obtained accident reports, incident reports or any other document or report from an agent or agency of defendant CITY that corroborated that defendant CITY, was involved in causing damage to the property of a claimant;
>
> **g)** Making sure a claimant established the cost of damages by submitting documentation sufficient for a PD Claim Examiner to believe that such document represented the true cost of repairing the damages attributable to the actions or inactions of defendant CITY.

72.     At that meeting GRAHAM warned GONZALEZ that in PD:

**a)** Over five hundred (500) aging claims, which increased daily, had been neglected by the former PD Chief and required attention to avoid complaint letters to KIM and to Comptroller, and;

**b)** GONZALEZ should focus on "fixing" PD and reviewing new claims since GRAHAM would "run interference" and address the aging claims, and;

**c)** The morale was at an all-time low and that GONZALEZ would have to turn that situation around, and;

**d)** That PD Claims Examiners ("CE's") were out of control and untouchable because they were all union members, except for Luc R. Pierre, and;

73.    As Chief of PD, GONZALEZ reviewed and audited PD and found that:

**a)** Claims were electronically assigned to CE's and were not evenly distributed resulting in disproportionately unbalanced caseloads, and;

**b)** CE'S received no training in making determinations of standing, and;

**c)** CE'S received no training in how to evaluate damage repair estimates, and;

**d)** CE's were mandated by defendants CITY, KIM, COX, REILLY and the Comptroller to settle claims to "keep claimants happy", to avoid complaints to Comptroller in social media, by telephone or by mail, and to get rid of PD claims as fast as they could;

**e)** In response to said mandate, the CE assigned to adjust claims, classified as "defective roadway claims" settled approximately three thousand (3,000) of them from May 2014 through May 2015 without determining whether defendant CITY was legally liable.

**f)** Although it was the responsibility of BRUSGARD and the other PD supervisor to conduct a second review of the Defective Roadway claims to make sure and require that a determination of liability was made by the CE as a condition to authorizing payment, BRUSGARD and the other supervisor failed to do so and authorized payments on said claims causing defendant CITY to expend taxpayer funds, which GONZALEZ reasonably believed to be a violation of law, official misconduct, government waste or at a minimum mismanagement, and;

**g)** That in order to make liability determinations of defective Roadway claims, PD depended on agency reports from the Department of Transportation ("DOT") an agency of defendant CITY, and;

**h)** That DOT reports would enable PD to determine whether defendant CITY had prior written notice of a roadway defect, a requirement to establish liability against CITY and to pay on a claim, and;

**i)** That at all times relevant to this action, PD requested DOT reports on as many as five (5) times, yet DOT was unresponsive thereby rendering PD unable to make any such liability determinations, and;

**j)** That PD continued settling and expending taxpayer funds on defective roadway claims without liability determinations in order to:

    **i)** Keep claimants "happy" with COMPTROLLERS "work", and;

    **ii)** Appeal to white claimants that were prospective voters, and;

    **iii)** Report high settlement statistics to integrate them into and make them part of the COMPTROLLER'S published annual Claims Report, and;

**iv)** Accelerate the disposition rate of PD claims for COMPTROLLER to brag about how "efficient" his administration is, in the press, and;

**v)** Further the personal and professional career advancement of defendants KIM, COX, REILLY and COMPTROLLER.

**k)** PD received approximately thirty-five thousand (35,000) telephone calls per year and about fourteen thousand (14,000) claims per year.

**l)** CE's felt that defendants CITY, KIM, COX and REILLY, treated them as second-class citizens and were looking for justifications to fire them, and;

**m)** Whenever a claimant, that was politically connected with defendants CITY, KIM, COX and REILLY, and with COMPTROLLER or with the General Counsel, called to complain that their case was not being settled fast enough or not being settled for the amount they demanded, the evaluations and findings of the CE's were disregarded and over-ridden by said defendants who then ordered payments for the amounts demanded in the respective notices of claims. For example, GONZALEZ was once ordered by COX to pay the $3,500 claim of a white claimant and resident of Staten Island for a knocked over mail box and post, a new one of which GONZALEZ determined cost slightly under $75.00 at Home Depot, and;

**n)** That various repair estimates found in motor vehicle accident claims were exaggerated, exceeded the scope of repairs and notwithstanding, CE's paid the claims and BRUSGARD authored the payments from taxpayer funds, and;

**o)** That CE's believed that no matter how much they produced or how well they performed in PD, that the only way to earn a merit raise was to transfer out of PD into

the PI division across the hall from PD where their colleagues worked at and received merit raises.

**p)** CE's also believed that filing grievances against the COMPTROLLER'S administration was another way of attaining salary increases or promotions, and;

**q)**  The CE's were frustrated, felt overworked, unappreciated and believed they were trapped in a dead-end job with no chance of upward mobility or salary increases, and;

**r)** The high volume of claims coupled the inability and/or delays in getting CITY agency accident reports prompted high call volumes from claimants, politicians and from irate and disrespectful callers prevented CE's from settling claims and further aggravating an already stressful job, and;

**s)** That when "confrontational", "angry" "unsatisfied" or "aggressive" claimants called or visited PD, the CE's paid one hundred percent (100%) of whatever the claimant demanded, irrespective of whether any CE evaluation warranted a lower payment, and;

**t)** That CE's paid PD claims based on any printout of any document that purported to represent a bill an invoice or payment for damage presented by a claimant, without the CE verifying its validity, and;

**u)** That there were no written policies or procedures for handling, evaluating or negotiating PD claims, and;

**v)** That claims involving damage to motor vehicles, damage to real property and/or damage to personal property, defendants CITY, KIM, COX and REILLY did not require claimants to establish that they were the titled or lawful owner of said motor

vehicle, real property and/or personal property, yet the CE's paid the claims and BRUSGARD countersigned the payments, and;

**w)** That for claims involving damage to motor vehicles, damage to real property and/or damage to personal property, where Pro Se claimants were not the lawful owner, PD did not require a duly executed valid power of attorney form from the lawful owner authorizing another natural person to make or present a claim on behalf of the lawful owner as a condition to PD making payment, and;

**x)** For claims made by corporations representing themselves, PD did not require corporate resolutions wherein the corporate claimant would authorize its representative to file, prosecute or receive payment on said claim, and;

**y)** Defendants CITY, KIM, COX and REILLY did not want PD to require claimants to submit photos of damages as a condition for payment even where photos of damages and/or of defective conditions would aid the CE in evaluating or determining whether or not defendant CITY was liable to a claimant and/or if so, then to what extent.

**z)** The CE'S felt they had no choice but to pay claimants everything they asked for in their respective claims to avoid retribution from defendants CITY, KIM, REILLY and COX.

**aa)** That claimants regularly complained about the delays associated with the handling of their PD claims and that GONZALEZ' predecessor spend a substantial amount of his time appeasing claimants giving claimants what they asked for.

74. **"**Defective Roadway" claims was the label assigned by defendant CITY to any claim involving damage to a motor vehicle purportedly caused by a defect on the surface of any

roadway that defendant CITY owned, operated, maintained or was otherwise responsible for keeping in a reasonably safe condition, and;

75.     After finding the above, GONZALEZ implemented measures to create transparency in PD, to improve the operation of PD, to improve the quality of work-life for the PD team. GONZALEZ instituted procedures to safeguard taxpayer dollars and to improve the efficiency of PD and to streamline the settlement of claims. GONZALEZ:

**a)**  Regularly met with every PD Claim Examiner, with BRUSGARD and the other supervisor and discussed the laws applicable to claims, analysed damages, and damage estimates as a way of training one CE at a time as well as BRUSGARD and the other supervisor, using an actual claim, on how to conduct a complete and adequate evaluation that was fair to defendant CITY and the Claimants.

**b)** Made obtaining photographs, when available, a requirement to adjusting claims.

**c)** Ended the adjustment of defective roadway and any other claims until such time as PD was able to determine whether defendant CITY was liable to a claimant.

**d)** Refused to authorize payments of claims referred to PD by politicians where CITY liability could not be established.

**e)** Ended the practice of taking of claims out of turn based on the political connection between claimant and defendant CITY or any of its servants, agents or employees.

**f)** Required that corporate claimants submit duly executed corporate resolutions delegating authority, in writing, to their representative claimants as a condition of having their claim adjusted;

**g)** Required that CE's document their liability determinations, their estimate analysis and their reasoning for paying a claim they wanted GONZALEZ to authorize.

18

**h)** Required that Titles, Certificates of Origin, Deeds or any other document evidencing ownership over an item alleged to have been damaged by defendant CITY, its agents, servants and or employees be presented to PD to prove standing as a condition of settlement or in the alternative, a duly executed Power of Attorney form authorizing a non-titled claimant to file a claim, as a condition of processing a claim by PD.

**i)** Met with internal stakeholders to streamline the claims handling process by reducing outdated redundancies, by revising form letters sent to claimants and opening lines of communications between the information technology ("IT") team and PD;

**j)** Implemented policies and procedures for handling claims whenever a member of PD was out of the office.

**k)** Implemented protocols for responding to telephone calls in PD and best practices for addressing claimants who called PD.

**l)** Required coverage and responses to claimant calls and inquiries.

**m)** Created and implemented a system to capture metrics that would enable PD to determine whether adjustments were necessary in the way RFA's/Action Started cases were handled by PD in order to increase productivity and identify cost savings areas of opportunity and the correlation between the pre-suit and post litigation payment amounts.

**n)** Created and implemented a system to capture metrics to monitor claimants suspected of submitting excessive and/or fraudulent damage repair estimates and claimants suspected of making fraudulent claims as a tool to root out waste, fraud and

abuse found in the PD claim settlement procedures, and to safeguard the fiscal health of the CITY.

**o)** Conducted teambuilding exercises that reduced animosity and improved employee Morale.

**p)** Asked defendants KIM and COX to allow PD Claim Examiners to attend CITY agency sponsored training of the following courses:

> **i-** Delivering Quality Customer Service;
>
> **ii-** Managing multiple priorities;
>
> **iii-** Time management skills, and;
>
> **iv-** Continuing Legal Education (at PLI).

**q)** Petitioned defendant KIM to allow the modification of the Claims assignment process, as it existed at the time, to create a balanced work load model for the PD Claim Examiners.

**r)** Notified defendant KIM, COX and REILLY that from 2014 for the same period of 3-1-15 through 10-31-15, under the leadership of GONZALEZ, PD saved over 1.7 million dollars.

76.     During the time GONZALEZ implemented the abovementioned measures, GONZALEZ still reported directly to GRAHAM and GRAHAM authorized and ratified the above without reservations.

77.     Throughout GONZALEZ' tenure as PD Chief during the time GRAHAM was his supervisor, GRAHAM communicated no complaints to GONZALEZ, and instead GRAHAM praised GONZALEZ' work.

78.     As Chief of PD, GONZALEZ spent most of his time meeting with members of his PD team, either in their cubicles, in the large conference room in BLA or in the office of internal stakeholders in different bureaus of the COMPTROLLER's Office or with external stakeholders.

79.     On or about July 31, 2015, GRAHAM retired.

80.     On or about August 4, 2015, defendant COX was promoted to Director of S & A in BLA replacing GRAHAM and overseeing PD.

81.     On or about September 9, 2015, GONZALEZ applied for the position of Deputy Director of Settlements and Adjudications.

82.     As part of his application, GONZALEZ submitted the same credentials he submitted in his application for the position of Chief of PD.

83.     GONZALEZ expected the "job interview" for Deputy Director of Settlements and Adjudications to be about qualifications, experience and leadership related inquiries, instead GONZALEZ found himself defending his integrity and his career choices in front of the interview panellists who were defendant KIM, defendant COX and the General Counsel, Kathryn E. Diaz, each of whom used that time to ridicule, belittle and criticize GONZALEZ for applying to the job.

84.     On or about September 17, 2015, defendant REILLY was promoted to Deputy Director of Settlements and Adjudications.

85.     GONZALEZ had the fourteen-year experience in the Comptroller's Office that REILLY did not have, and REILLY had less than one (1) year of experience evaluating lower exposure cases under the supervision of GONZALEZ.

86.     GONZALEZ was better qualified than REILLY, yet defendant CITY, KIM and COX failed to promote him, selecting REILLY instead.

87.     At all times relevant to this action, the BLA team that managed the day-to-day operations of BLA was comprised of only white people. Defendant KIM, defendant COX, KARP and defendant REILLY.

88.     In conversations GONZALEZ had with defendant KIM, KIM had expressed disdain, on several occasions, for people of color.  During the review of a request for settlement authority from Corporation Counsel late in 2014, KIM remarked: that it was always the blacks who were suing the CITY for wrongful incarceration and excessive force; That after committing crimes and getting away with it, "they" wanted to get paid on top of that; That it would be cheaper for the CITY if the police killed some of these guys instead of just beating them up.

89.     On another occasion also in or about August 2014, defendant KIM asked GONZALEZ whether Mr. Bernard Londin was ever going to retire or whether he could find a way to get rid of Mr. Londin because he was too old for the job, he was set in his ways and he made too much money.

90.     At all times relevant to this action, Mr. Londin has been a Comptroller Court Rep employed by defendant CITY for over thirty-five (35) years, is over the age of 70, and an icon in the Courts. He is also a well-known, liked and respected attorney.

91.     Sometime in the summer of 2015, GONZALEZ overheard defendant Reilly complain in BLA that these "black people", when referring to the African American Claim Examiners, were the trouble makers in the office.

92.     On at least three other occasions in December 2015, defendant REILLY told

GONZALEZ to make sure the PD cases moved as fast as they did with his predecessor

because claimants were complaining to her, to defendant COX, to defendant KIM and the

COMPTROLLER'S administration that they were not getting paid.

93.     On another occasion in late December 2015, defendant REILLY told GONZALEZ

that he was making her, defendant KIM and COX "look foolish" and unable to control their

PD people.

94.     In early January 2016, REILLY told GONZALEZ that he needed to "get on board"

with moving the PD cases or GONZALEZ might not be sitting in "that chair much longer"

(referring to the chair in the PD office of GONZALEZ).

95.     On another occasion in early January 2016, defendant REILLY told GONZALEZ: "if

I were you, I would do like David did and stay out of people's way". David was the former

Chief of PD and predecessor to GONZALEZ. Defendant REILLY also told GONZALEZ that

GONZALEZ had no one in BLA to "protect him or his job" and that he should reconsider his

position.

96.     Defendant KIM told GONZALEZ that KIM wanted PD to keep a low profile and get

rid of the claims as fast as possible; that no one cared how much PD spends.

97.     Shortly after defendant COX's promotion, COX expressed concern over the Defective

Roadway claims ordering GONZALEZ to settle them with or without liability because PD

was the "face of the COMPTROLLER" and because "it was an election year".

98.     GONZALEZ explained to COX that he was following the new policies and

procedures endorsed by GRAHAM and COX insisted he just wanted cases settled like they had been before GONZALEZ took over PD; that up until GONZALEZ took over PD, PD was virtually unheard of in BLA.

99.    In late December 2015, Defendant COX told GONZALEZ that the PD claims "had such low demands" that even if PD paid every one of them, that the amount of money it would cost the CITY, in the whole scheme of things, would be so insignificant that no one would even care to look twice; that on the other hand, the benefit to "all of us" in BLA would outweigh the expense, by a long shot.

100.    In late December 2015, Cox personally ordered GONZALEZ several times to speed up the payment on PD claims to "keep the Comptroller and KIM happy" and since it was "politics [GONZALEZ] need[ed] to get with the program".

101.    In late December 2015, Cox personally ordered GONZALEZ to make sure that the "friends of the Comptroller" were satisfied with the way their PD Claims were handled.

102.    On or about December 2015, GONZALEZ handed defendant COX a three (3) page written document wherein GONZALEZ memorialized his findings in PD.  Said findings include those that have been itemized above.

103.    Defendant COX became furious with GONZALEZ yelling that GONZALEZ should not have reduced that content to writing and that GONZALEZ "[didn't] get it", that all GONZALEZ had to do was "go along with the way things were in PD" and "keep a low profile" to do "what is expected of you" and everyone will be happy and GONZALEZ would have "no problems with anyone"

104.     On or about December 2015, GONZALEZ personally handed defendant KIM a copy of the same three-page written document he handed COX, which memorialized his findings in PD.  Those findings include the ones itemized in the above allegations.

105.     Defendant KIM became enraged telling GONZALEZ that he knew better than to "put that shit in writing". KIM told GONZALEZ that: a) GONZALEZ has not fired the black guy (Luc Pierre); b)  that GONZALEZ applied for a job he "knew all along" was for "Katie", (referring to defendant REILLY);c) That PD was not moving cases as fast as he needed them to move and that GONZALEZ had "pissed off" a lot of people in the office with the PD changes and the accusations that BLA was putting out false statistics.

106.     At all times relevant to this action, members of the DOE were overpaying on DOE claims and were knowingly marking claims and lawsuits settled, dismissed, action started and/or withdrawn when in fact most of said claims and lawsuits were still active and pending in BLA.

107.     GONZALEZ believes that over nine thousand (9,000) DOE claims or lawsuits were overpaid and used to create false data, false metrics and false and inflated statistical values that were used and incorporated into the yearly "Claims Report(s)" prepared by defendant KIM, and the COMPTROLLER and then published in the press, in CITY documents and shared with the New York City Corporation Counsel's Office.

108.     From the time of KIM's appointment, on April 30, 2014, as Assistant Comptroller in the Comptroller's Office through January 2016, GONZALEZ personally informed KIM multiple times that:

**a)** the Department of Education ("DOE") team was intentionally altering, inflating and manipulating the dispositions of claims and lawsuits filed in the various counties on office records to reflect high rates and speeds of dispositions.

**b)** As a result of the above, fraudulent and manipulated data was being recorded into the COMPTROLLER's Office databases, in COMPTROLLER documents, published in reports shared with the New York City Law Department, for them to incorporate into other reports and for COMPTROLLER to use in press releases, but KIM took no known action about the situation;

**c)** The DOE team was overpaying on DOE claims and lawsuits against CITY;

**d)** DOE cases were being settled without proper investigations or adequate liability determinations, and KIM replied that "it was all about statistics".

109.    As the individual in Charge of BLA, KIM was in a position to end the abovementioned practice but failed to do, choosing instead to overlook what was going on.

110.    On or about May 2, 2016, Adam S. Karp ("KARP") started in BLA as Director of Torts.

111.    A few days later, GONZALEZ welcomed KARP, met with him in the conference room next to his office and informed KARP that GONZALEZ had told defendant KIM, and that KIM took no action about the disposition issues itemized above.

112.    GONZALEZ later learned that William J. Kuehl ("Kuehl"), a White male, was accused of marking cases as being disposed of to create high disposition statistics that were false, and that this alleged practice by Kuehl was known to KIM and Michael Aaronson, who encouraged said practice and enabled it.

113.    Kuehl's conduct and the response or lack thereof was known to the New York City Law Department and the Comptroller.

114.    Once Karp, the Director of Torts, became aware of Kuehl's alleged practice, Karp stopped it, and reassigned all of Kuehl's cases to be reviewed by other Division Chiefs, including defendant MAGLIO-SCOTTI, Kevin Bryant and the newly appointed DOE Chief.

115.    From that point forward, Kuehl was no longer permitted to settle any cases without supervision and approval.

116.    Kuehl who is white, did not suffer any reduction of salary or demotion.

117.    BLA had a practice of imposing settlement quotas on the Chiefs and their respective Claim Examiners and of comparing statistics of settlements and dispositions by and between said Chiefs and their respective teams of Claim Examiners as a vehicle to create competitions as to which BLA team settled the most claims.

118.    It was common knowledge in BLA that "merit' raises were awarded to those PI members that demonstrated the highest rates of settlements and or dispositions in the shortest periods of time.

119.    Most of the beneficiaries of the "political settlements or dispositions" were Caucasians and/or political supporters of the Comptroller and/or politicians.

120.    A few examples of settlements done for political reasons include the "Central Park Five" case and the Jabbar Collins case.

121.    In the "Central Park Five" case, New York City Mayor, Bill DeBlasio reached an agreement with the Plaintiff's in that case settling the case without prior approval from Comptroller Stringer. When GONZALEZ objected to the way the matter was handled, and refused to endorse the settlement, albeit after the fact, KIM became visibly angry at

GONZALEZ, yelling that it was a "f_ _ king" political settlement that GONZALEZ had to endorse because KIM, the Comptroller and his General Counsel, (Kathryn E. Diaz) wanted to document an internal consensus by the COMPTROLLER's people. Notwithstanding, GONZALEZ did not acquiesce.

122.    In the matter of Jabbar Collins, GONZALEZ assigned the matter to a Court Rep to prepare an internal Memo requesting settlement authority for an amount consistent with comparable verdicts and settlements for the same or similar damages as Mr. Collins.

123.    The request for authority returned by the Court Rep was less than the money demanded of CITY by the Attorneys for Collins and by Corp Counsel.

124.    GONZALEZ believed the amount of money that the research of the Court Rep yielded, when coupled with money the State of New York would pay, would constitute a fair global settlement for the losses suffered by Mr. Collins.  The next GONZALEZ heard of the Collins case was that COMPTROLLER had paid more than the research yielded and that GONZALEZ' appeared on a settlement document misrepresenting that GONZALEZ concurred with the eventual higher seven figure pay out.

125.    When GONZALEZ asked to delete his name from the settlement document, KIM told GONZALEZ that it was a political settlement beyond the "pay grade" of GONZALEZ, "period".

126.    GONZALEZ refused to settle claims based upon the personal interests, career ambitions and political considerations of KIM, COX, REILLY and the COMPTROLLER.

127.    On or about January 15, 2016, less than one year after his promotion to Division Chief of PD, GONZALEZ was called to defendant KIM's Office to meet with KIM and Amedeo D'Angelo.  D'Angelo was Deputy Comptroller for Administration.

128.    D'Angelo told GONZALEZ that KIM wanted GONZALEZ out of PD offering several alternate justifications which GONZALEZ refuted offering evidence to the contrary.

129.    After a brief discussion, GONZALEZ was told that in the end, the reason KIM wanted GONZALEZ out of PD did not matter, and that GONZALEZ was being demoted with a reduction in salary.

130.    GONZALEZ was not afforded any valid reason other than GONZALEZ was not a "fit" in KIM'S administration and that it was part of a reorganization.

131.    Not being a "fit" is euphemism for unlawful discrimination and retaliation by Kim.

132.    GONZALEZ never had any performance issues to warrant a demotion and reduction in compensation.

133.    Once demoted, GONZALEZ was ordered to report to the Motor Vehicle Team and report to defendant MAGLIO-SCOTTI, who became his immediate supervisor.

134.    In his demoted position, GONZALEZ spent seven to eight hours seated in front a computer terminal typing in data.

135.    GONZALEZ' responsibilities were lower than what they were when GONZALEZ began working in the Comptroller's Office in 2002.  Gonzalez was assigned clerical duties including retrieving and reading mail, sending out mail and making data entries summarizing the mail, among other ministerial duties.

136.    On January 19, 2016, Mike Aaronson, the former BLA Director of Torts, publicly announced to GONZALEZ, in front of his new M/V co-workers and peers that GONZALEZ's settlement authority had been reduced from two hundred and fifty thousand ($250,000.00) to twenty-five thousand ($25,000.00), the amount of authority granted GONZALEZ back in 2002.

137.    Defendant MAGLIO-SCOTTI was unhappy with the fact that GONZALEZ had been previously assigned to negotiate higher profile cases instead of her and was also unhappy that GONZALEZ had been ascended to Senior Court Rep to supervise her "friends" who worked for the CITY for over twenty (20) years. In fact, defendant MAGLIO-SCOTTI stopped speaking to GONZALEZ at that time.

138.    Defendant KIM was aware of the foregoing facts.

139.    Defendant KIM was aware that GONZALEZ taught defendant MAGLIO-SCOTTI, who was the Chief of the M/V team, that a registered owner of a motor vehicle was not necessarily the same as the titled owner, and that as a matter of standing, MAGLIO-SCOTTI was required to determine that in evaluating the M/V claims. Defendant KIM also knew, defendant MAGLIO-SCOTTI resented GONZALEZ and that on the day GONZALEZ was demoted GONZALEZ requested to be placed anywhere in the agency other than with defendant MAGLIO-SCOTTI.

140.    KIM ignored GONZALEZ' request for a transfer out of the M/V team.

141.    On February 24, 2016, BRUSGARD, a White female less experienced and less qualified than GONZALEZ was appointed Chief of PD.

142.    BRUSGARD was the PD supervisor that had authorized payments on the more than three (3,000) Roadway Damage Claims where no determination of liability against CITY were made.

143.    BRUSGARD was not qualified to lead PD and certainly should not have been allowed to expend and/or authorize the expenditure of taxpayer funds without permanent and constant oversight.

144.   As a subordinate to GONZALEZ, GONZALEZ was familiar with the professional and personal abilities and limitations of BRUSGARD which he personally witnessed during his interaction with BRUSGARD and during his review of her work when GONZALEZ led PD.

145.   Several weeks after his new assignment to the M/V team GONZALEZ began to feel instances of waist and back pain causing him to increase his doses of pain medication and to take time off to visit with physicians. This was partly due to sitting for long periods.

146.   On or between April 1, 2016 and April 6, 2016, defendant MAGLIO-SCOTTI ordered GONZALEZ, under threat of discipline, to look at all the documents located in boxes that GONZALEZ had to identify, organize and label all fifty-four (54) boxes which GONZALEZ had stored in PD and accumulated over his fourteen (14) year career in BLA.

147.   When GONZALEZ asked defendant MAGLIO-SCOTTI for assistance because of his back problems and that he needed more than two (2) days within which to complete that task, defendant MAGLIO-SCOTTI refused his request for assistance and ordered GONZALEZ to "get it done in two days or I'll write you up".

148.   MAGLIO-SCOTTI was fully aware that without help GONZALEZ' back injuries would be aggravated, but she still refused him help.

149.   The fifty-four (54) boxes had the capacity to hold approximately five-hundred, eight and a half inch by eleven-inch (8.5" x 11") sheets of paper weighing approximately fifty (50) pounds each.

150.   Defendant CITY, BLA and defendant MAGLIO-SCOTTI were all fully aware that GONZALEZ was suffering from spinal injuries from bulges and herniations to his neck and back, for which spinal fusion surgery in the neck and back had been recommended.

151. To avoid the charges of discipline, GONZALEZ complied with defendant MAGLIO-SCOTTI's order and emptied out every one of the fifty-four (54) boxes, identified each paper from every box, sorted the papers and placed them in boxes which he labelled; "store", "shred", "recycle" and "personal items" GONZALEZ then lifted and moved them to an area designated by defendant MAGLIO-SCOTTI and defendant KIM.

152. GONZALEZ completed this task in the two days he was allotted.

153. Lifting and moving those boxes caused GONZALEZ to aggravate his pre-existing spinal injuries and to suffer pain to his head, neck, waist and back and to endure flare-ups and sporadic muscular spasms requiring stronger doses of pain medication which included Percocet, Oxycodone, muscle relaxers and aspirin.

154. Those medications alleviated the pain but made GONZALEZ ill and interfered with his ability to remain seated or standing for extended periods of time and his ability to perform data entry duties at work.

155. From the increased doses of medication, GONZALEZ suffered upset stomach, diahrrea and vomiting during working hours.

156. Those injuries progressively interfered with the ability of GONZALEZ to conduct data entry from a seated position in front of a computer screen for extended periods of time.

157. As a result of moving said boxes, GONZALEZ was caused to take a medical leave of absence from May 9, 2016 through August 1, 2016, to expend annual leave time and leave without pay, in order to heal.

158. GONZALEZ applied for leave without pay to fully recover his back injuries and it was denied by defendant KIM.

159.    Having denied GONZALEZ' application for leave without pay, defendants MAGLIO-SCOTTI and KIM seized the opportunity to now charge GONZALEZ with incompetence for "excessive absenteeism" for "…fail[ing] to comply with time and leave procedures promulgated by … (defendant) CITY of New York… and the Office of the Comptroller"

160.    Defendant CITY, and the Comptroller's Office failed to implement or follow their own "Absence Control Program" which they claim to use as part of their "progressive discipline procedures" which the CITY and Comptroller must follow before filing grievances in OATH against a CITY employee pursuant to Civil Service Law, the CITY's rules, regulations, and the Comptroller's rules, policies and procedures.

161.    Defendants CITY, KIM, COX, REILLY and MAGLIO-SCOTTI failed to place GONZALEZ on an "Absence Control Stepping Point System" Calendar.

162.    Defendants CITY, KIM, COX, REILLY and MAGLIO-SCOTTI failed to hold any "Supervisory Conference(s)" with GONZALEZ regarding the "Step or points" to be quantified regarding documented or undocumented sick leave or instances of absenteeism.

163.    Defendants CITY, KIM, COX, REILLY and MAGLIO-SCOTTI failed to "write-up" GONZALEZ or notify GONZALEZ that the purported "excessive absenteeism" was unacceptable.

164.    By failing to follow the CITY's own attendance related rules and procedures, defendants gave GONZALEZ a false sense of security in believing that any such absences were condoned and that defendants had no problem with GONZALEZ being out of the office.

165.    On August 25, 2016 defendants denied GONZALEZ the medical leave he had applied

for on August 15, 2016, despite MAGLIO-SCOTTI informing GONZALEZ earlier that the

period GONZALEZ was asking for was the slow period at the office and that the M/V Claim

Examiners were hardly busy during that time.

166.    On September 21, 2016, GONZALEZ filed an internal Equal Employment

Opportunity Discrimination Complaint with the Comptroller's designated agency "EEO

Officers" against defendants KIM, COX MAGLIO-SCOTTI and REILLY.

167.    On September 21, 2016 GONZALEZ filed an Internal Grievance Complaint with

Comptroller Stringer, with the First Deputy Comptroller and with the Comptrollers Chief of

Staff, the three highest officials in the Comptroller's Office. GONZALEZ complained about:

     **a)** The August 25, 2016 denial of his request for reasonable accommodation for time

     out of the office to continue necessary medical treatment, and;

     **b)** Being removed from the leadership position of Chief of PD for:

          **i-** Refusing to settle claims where appropriate investigations had not been

          completed, and;

          **ii-**Refusing to approve payment from taxpayer funds to resolve claims that

          were either not investigated or haphazardly investigated, and;

          **iii-** Refusing to condone the manipulation and reporting of false claim

          disposition data in PD and DOE, and;

          **iv-** Refusing to take part in a de-facto scheme to buy taxpayer votes, and;

          **v-** Creating policies and procedures in PD to root out fraud and abuse found in

          claims, and;

          **vi-** Refusing to favour politically connected claimants, and;

34

**vii-** Denying him promotions for being a Latino male over the age of 40

168.    On or about November 7, 2016, GONZALEZ filed an unlawful discrimination and retaliation complaint with the United States Equal Employment Opportunity Commission ("EEOC"), against the defendants and the Comptroller's Office.

169.    On November 20, 2016, GONZALEZ applied to the Senior Court Representative position announced under JVN: 015/017/027 in BLA-a position which he had held competently and successfully for over three (3) years.  However, GONZALEZ was not interviewed for said position.

170.    GONZALEZ served in the capacity of Senior Court Representative at BLA from December 2002 through February 2016.

171.    Defendants promoted a recent BLA hire ("Rohit") who is less qualified and less experienced than GONZALEZ.

172.    On or about January 13, 2017, GONZALEZ filed an unlawful discrimination and corruption complaint against defendants, with the Department of Investigations of the City of New York.  GONZALEZ complained of official misconduct, mismanagement and corruption by members of the NYC Comptroller's Office.

173.    Following the filing of the aforesaid complaints by GONZALEZ, defendant MAGLIO-SCOTTI told GONZALEZ that he would be taught a lesson not to "rock the boat" and that in time, she would get rid of him just like she did with Karen.

174.    Karen was a former CITY employee, of Latino descent over the age of 40, that was assigned to defendant MAGLIO-SCOTTI's M/V team and was subsequently terminated after being persecuted by defendant MAGLIO-SCOTTI.

175.    Defendant MAGLIO-SCOTTI warned GONZALEZ that it was a matter of time before she "got something on [him]".

176.    Defendant MAGLIO-SCOTTI told GONZALEZ that she would not sign his time sheets until she felt like it.

177.    Defendant MAGLIO-SCOTTI told GONZALEZ he could not negotiate any cases without prior clearance from her although she knew GONZALEZ was an experienced and capable negotiator.

178.    In contrast to GONZALEZ, defendant MAGLIO-SCOTTI allowed Maria Giordano, a white female Claims Examiner and Tom DeMaria, a white male Claims Examiner, to negotiate cases without prior clearance from her.

179.    On or about February 13, 2017, within one month of the aforesaid corruption and discrimination complaint filed with the NYCDOI, and after filing the three (3) complaints against defendants, defendants filed charges of employment misconduct against GONZALEZ based upon incidents, among others, which allegedly occurred between November 2, 2002 and November 20, 2016, a period of 14 years.

180.    The aforesaid charges were filed before the Office of Administrative Trials and Hearings ("OATH").

181.    Without the active participation of defendants KIM, COX, REILLY and MAGLIO-SCOTTI, the charges before OATH could not be brought against GONZALEZ.

182.    In fact, MAGLIO-SCOTTI was the witness who testified on behalf of the defendants in support of the charges against GONZALEZ before OATH.

183.    The filing of the charges of employee misconduct against GONZALEZ before OATH were done to intimidate and harass him, to prevent him from seeking judicial redress, and in

retaliation for GONZALEZ having filed the abovementioned complaints with their respective allegations against the defendants.

184. After an Administrative trial in OATH, GONZALEZ was found guilty, although there was no evidence or factual allegations to support the charges or a finding of guilt.

185. Defendant's wrongfully terminated GONZALEZ's employment and Civil Service career with the CITY using the OATH findings as a pretext as one of the bases to do so.

186. Defendant CITY through BLA customarily discriminates against people of color over the age of 40 causing them to be subjected to the violation of their legal rights. The CITY does so persistently and regularly such that it constitutes a customary practice and pattern.

187. Defendant CITY regularly fails, and in the instant case failed, to properly train or supervise its employees including defendant KIM, COX, REILLY and MAGLIO-SCOTTI on how to perform their jobs devoid of unlawful discrimination such that discrimination has become a prevalent and customary practice of theirs. For example: The following older minorities of color over the age of 40 have been discriminated against by CITY:

> **a)** Ms. Marie Mohan (MOHAN), a Black female, over 50 years of age. MOHAN was demoted when she, as a member of the DOE team, complained to defendant CITY and defendant KIM, that the DOE team was falsely reporting the dispositions of DOE related claims and cases. Defendant CITY, KIM and/or Comptroller demoted MOHAN, drastically cut her pay in or about January 2016. However, defendant CITY or KIM did not do a similar thing to William J. Kuehl, a white male who was similarly situated to MOHAN and a member of the DOE team whom was accused of altering said claims and cases. Mohan has since filed a Federal action against defendant CITY in the Federal District Court for the Southern District of New York ("SDNY") under index number 17-cv-3820 (KPF);

> **b)** Mr. Luc R. Pierre (PIERRE), a Black male over 50 years of age. Pierre has since filed a Federal action against defendant CITY, KIM, REILLY, COX and other members of the Comptroller's office for discrimination and retaliation in the Federal District Court for the Southern District of New York ("SDNY") under index number 17-cv- 05782 (JGK);

> **g)** Plaintiff, Emilio Gonzalez.

188.    Plaintiff's demotion and salary cut followed the same pattern of treating older and minority employees differently and retaliating against them.

189.    GONZALEZ was not promoted to Deputy Director of Settlements and Adjudications or to Senior Court Rep, in part because, he was not white, but rather a Latino male over the age of 40.

190.    GONZALEZ was not promoted to Deputy Director of Settlements and Adjudications or to Senior Court Rep, in part for exposing, reporting and making public the stated wrongdoings he found in PD.

191.    GONZALEZ was not promoted to Deputy Director of Settlements and Adjudications or to Senior Court Rep, in part, for exposing, reporting and making public the practices of altering statistics and the false reporting of statistical disposition data by the DOE team and by PD and ultimately by defendant KIM, COX, REILLY and the Comptroller in his published Claims Report.

192.    GONZALEZ was not promoted to Deputy Director of Settlements and Adjudications in part because he refused to promote or engage in discrimination by not firing Luc Pierre as ordered by defendant KIM.

193.    GONZALEZ was charged with employee misconduct and subjected to trial in OATH, in part because of the various complaints he filed.

194.    The employment of GONZALEZ with CITY was terminated, in part, due to retaliation.

195.    At all times relevant to this action, every named defendant aided and abetted, contributed to and/or acted in concert with one another and/or individually in the

discriminatory and retaliatory adverse employment actions, inactions and/or omissions taken against GONZALEZ.

++++++++++++++++++++++++++++++++++++++++++++++++++++

### AS AND FOR A FIRST CAUSE OF ACTION FOR RETALIATION
#### 42 U.S.C. §1983

198.    Plaintiff repeats and realleges every allegation in each numbered paragraph above as if specifically set forth herein.

199.    KIM evinced his negative racial bias toward non-White, non-Asian people of color by his various actions. In February 2015, KIM directed GONZALEZ, as Division Chief, to fire Luc Pierre whom he referred to as the "Black guy" in GONZALEZ's new Division. In January 2016, KIM demoted Marie Mohan, African American, and reduced her salary by over S4,000.00.

200.    It is noteworthy that KIM did not demote Maria Giordano, White, who was similarly situated as Ms. Mohan, nor did KIM reduce Ms. Giordano's salary.

201.    When GONZALEZ failed to terminate Mr. Pierre, a competent worker, simply because he is "Black" and making more money than his colleagues, as directed by KIM, GONZALEZ was opposing unlawful race discrimination and engaging in protected activity.

202.    Defendants COX, REILLY and MAGLIO-SCOTTI became very hostile towards GONZALEZ and showed their hostility in various ways.

203.    In August 2015, a job vacancy announcement for the position of Deputy Director, Settlements & Adjudications was posted as JVN:015/016/002 and GONZALEZ applied in response to the job vacancy announcement.

204.    GONZALEZ was interviewed for the aforesaid Deputy Director position but was denied promotion to said position.

39

205.    Despite GONZALEZ's superior cognate experience and qualifications relative to defendant REILLY'S, defendants chose defendant REILLY for the aforesaid Deputy Director, Settlements & Adjudications position.

206.    Defendant KIM was a member of the panel that interviewed candidates for the aforesaid Deputy Director position.

207.    For purposes of selection and promotion to the Deputy Director position, defendants KIM and REILLY were final municipal policy makers for the CITY.

208.    The denial of the Deputy Director position to GONZALEZ in favor of defendant REILLY was partly in retaliation for GONZALEZ' refusal to Fire Luc R. Pierre as directed by defendant KIM.

209.    By reason of the foregoing, plaintiff has suffered loss and damage.


### AS AND FOR A SECOND CAUSE OF ACTION FOR DISCRIMINATION & RETALIATION: 42 USC §§1981 & 1983; NYCHRL

210.    Plaintiff repeats and realleges every allegation in each numbered paragraph above as if specifically set forth herein.

211.    Less than one year after his promotion to Division Chief, and after the denial of the position of Deputy Director, Settlements & Adjudications to him, on or about January 19, 2016, GONZALEZ was demoted by the Defendants from his Division Chief position and reassigned to the position of Administrative Claims Examiner I with a reduction in salary, to report to MAGLIO-SCOTTI.

212.    On the day that GONZALEZ was demoted from his PD Chief position, the two persons who were present and with whom GONZALEZ had a conversation were D'Angelo and defendant KIM. Both individuals informed GONZALEZ that he had been demoted and

D'Angelo handed him a note of the demotion.

213.    Although defendants COX and REILLY were not present at the time when the

demotion was communicated to GONZALEZ, the facts upon which defendants based their

termination were developed and supplied by defendants COX and REILLY and could not

have been known to KIM and D'Angelo.

214.    Defendants COX and REILLY aided and abetted KIM in demoting GONZALEZ.

215.    By taking adverse employment actions against GONZALEZ and demoting him from

his Division Chief position with reduced pay, as aforesaid, defendants KIM, COX and

REILLY were retaliating against GONZALEZ, partly because of his refusal to engage in

intentional race discrimination against Luc Pierre.

216     By reason of the foregoing, Plaintiff has suffered loss and damage.

### AS AND FOR A THIRD CAUSE OF ACTION FOR CONTINUING RETALIATION: 42 USC §1983; NYCHRL

217.    Plaintiff repeats and realleges every allegation in each numbered paragraph above as

if specifically set forth herein.

218.    On or about November 20, 2016, GONZALEZ applied for the vacant position of

Senior Court Representative (JVN: 015/017/027) which he had previously held successfully

for many years.

219.    By virtue of having previously successfully holding the title, GONZALEZ applied for

the position believing he was the most qualified person for the position.

220.    GONZALEZ was not even interviewed for the position. He was denied the promotion

without an interview.

221.    Instead, one Rohit, a new younger hire in BLA was promoted to the position.

222.   For purposes of selection and promotion to the Senior Court Representative position, defendants KIM and REILLY were final municipal policy makers for the CITY.

223.   GONZALEZ believes that the refusal to even interview him, let alone promote him to the position in November 2016 was partly in retaliation for his recent filing of internal complaints and in continuing retaliation for exercising his First Amendment rights and refusing to engage in unlawful employment actions with the Defendants.

224.   By reason of the foregoing, Plaintiff has suffered loss and damage.

<u>AS AND FOR A FOURTH CAUSE OF ACTION FOR</u>
<u>RETALIATION: 42 USC §1983; NYCHRL</u>

225.   Plaintiff repeats and realleges every allegation in each numbered paragraph above as if specifically set forth herein.

226.   As noted above, on or about January 13, 2017, GONZALEZ filed an unlawful discrimination complaint against his supervisors with the Department of Investigations of the City of New York in which he also charged them with corruption.

227.   As noted above, defendant CITY failed to train defendants CITY, KIM, REILLY, COX and MAGLIO-SCOTTI on the need to respect and not violate the Civil and Constitutional Rights of employees, including GONZALEZ, by unlawful discrimination and retaliation.

228.   Defendants CITY, KIM, REILLY, COX and MAGLIO-SCOTTI have continued to retaliate against GONZALEZ by either providing the information with which to charge GONZALEZ with incompetence before OATH, or providing testimony before OATH to terminate GONZALEZ from his employment and civil service career – charges that would not likely have been brought but for the Defendants' desire to retaliate and intimidate GONZALEZ.

42

229.     Defendant's KIM, COX and REILLY were final municipal policy makers with

respect to the decision to bring charges before OATH against GONZALEZ which resulted in

GONZALEZ' termination.

230.     In a clear show of Defendants' intention to continue to intimidate and retaliate against

GONZALEZ, one of the charges brought against GONZALEZ at OATH dated back to events

which, according the specifications on the charge, occurred on *November 26, 2002*, known to

the Defendants some 15 years prior to the date of the charge.

231.     Said matter was investigated by the NYCDOI and the CITY was satisfied at the time

with the outcome of the investigation.

232.     Before OATH, Defendants charged GONZALEZ with submitting a Comprehensive

Personnel Document ("CPD") on November 26, 2002 in which he allegedly misrepresented

his title as Assistant District Attorney in the Kings County District Attorney's Office between

1993 and 1996.

234.     GONZALEZ in fact has documents to show that the Kings County District Attorney's

Office, including the overall boss, District Attorney Charles J. Hynes, referred to him as

Assistant District Attorney during the relevant period.

235.     Defendant CITY has terminated GONZALEZ from the New York City Civil Service.

236.     By reason of the foregoing, Plaintiff has suffered loss and damage.

<u>AS AND FOR FIFTH CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT,
VIOLATION OF DUE PROCESS, DISABILITY DISCRIMINATION & RETALIATION:
42 USC §1983; NYCHRL</u>

237.     Plaintiff repeats and realleges every allegation in each numbered paragraph above as

if specifically set forth herein.

238.    Between September 20, 2016 and January 13, 2017, when GONZALEZ filed an Internal Grievance, a discrimination complaint with the EEOC and a complaint with the NYCDOI, GONZALEZ was engaging in protected activities.

239.    Since about February 1, 2016 to the present, GONZALEZ has faced various medical problems including herniations in the spinal column which affect his neck, back and waist causing him inability to sit or stand for any extended period. GONZALEZ's condition also makes it almost impossible for GONZALEZ to sit and work behind a desk computer for any appreciable length of time.

240.    In or about March/April 2016, MAGLIO-SCOTTI directed GONZALEZ to personally sort through and move within a very limited time span, 54 heavy boxes that had previously been stored in the Property Damage Division. As GONZALEZ's direct supervisor at the time, MAGLIO-SCOTTI was fully aware of GONZALEZ's existing medical problems with his spine, neck, back, and waist.

241.    As of March-April 2016, GONZALEZ still had medical problems with his neck, back and waist, and was still disabled; GONZALEZ's physician had not cleared him to undertake the kind of heavy lifting task which MAGLIO-SCOTTI had instructed him to perform.

242.    MAGLIO-SCOTTI took the aforementioned actions knowing full well that in GONZALEZ' disabled state, GONZALEZ' disability would be exacerbated if GONZALEZ carried out her instruction and therefore intended to exacerbate GONZALEZ's disability.

243.    Because of this directive and limited time within which the task had to be accomplished, GONZALEZ asked MAGLIO-SCOTTI if she would let him have some help, but MAGLIO-SCOTTI insisted that GONZALEZ must do it alone and without any help.

244.   To avoid a charge of insubordination, GONZALEZ had to comply with MAGLIO-SCOTTI's back-breaking directive which further exacerbated GONZALEZ's existing-bad spine, neck, back and waist problems.

245.   Medical providers have suggested fusion surgery with paralysis as a prospective outcome for GONZALEZ's spine problem, an option which GONZALEZ has declined. GONZALEZ has opted for the non-surgical conservative alternative treatment which did not allow him to return to work at the time.

246.   At all times relevant to this claim, GONZALEZ was disabled and sought leave of absence without pay, as an accommodation for his disability; this was to enable GONZALEZ to fully recover from his disability, having exhausted his leave under FMLA.

247.   GONZALEZ would have been entitled to consideration for such leave of absence without pay pursuant to Civil Service Law, Sections 71 and 72.

248.   Defendants not only refused to consider GONZALEZ for the aforesaid leave of absence, Defendants would not even engage GONZALEZ in any good faith discussion of whether he could be accommodated.

249.   Since defendant MAGLIO-SCOTTI became GONZALEZ's supervisor, MAGLIO-SCOTTI had made it a point to routinely deny GONZALEZ's simple requests. On occasions when MAGLIO-SCOTTI granted such request, she would deny in writing that she had done so only to later admit that she granted the request but forgot that she did.

250.   MAGLIO-SCOTTI constantly wrote emails to GONZALEZ with the knowledge and acquiescence of KIM and REILLY, apparently to create a paper trail for taking adverse and/or punitive actions against GONZALEZ.

251.    Defendants' continuing refusal even in January 2017, to consider GONZALEZ for leave without pay is discrimination based upon GONZALEZ'S disability, denial of GONZALEZ's due process rights, and created a hostile work environment for GONZALEZ on the basis of his race and disability.

252.    The above-referenced conduct by the Defendants constitutes hostile work environment for the Plaintiff.

253.    The aforesaid conduct also constitutes disability discrimination against Plaintiff under NYCHRL.

254.    By reason of the foregoing, Plaintiff has suffered loss and damage.


### AS AND FOR A SIXTH CAUSE OF ACTION
### FOR CONSTRUCTIVE DISCHARGE:42 USC §1983; NYCHRL

255.    Plaintiff repeats and realleges every allegation in each numbered paragraph above as if specifically set forth herein.

256.    One of the charges against GONZALEZ before OATH for which Defendants sought to and did terminate his employment was "absenteeism" based upon GONZALEZ being out of work upon the recommendation of his physician.

257.    On March 9, 2018, GONZALEZ's physician re-evaluated GONZALEZ for the pain in his cervical and lumbar spine and, cleared him for immediate return to work. GONZALEZ's attorney promptly notified the Defendants of this fact in the hope that Defendants would ask plaintiff to return to work.

258.    Defendants never responded to his attorney and never asked GONZALEZ to return to work, or even responded to his offer to return to work. Rather, Defendants pressed forward and brought about the termination of his employment and Civil Service Career with OATH.

259.    By reason of the foregoing, plaintiff has suffered loss and damage.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR RETALIATION
## 42 USC §1983; NYCHRL

260.    Plaintiff repeats and realleges every allegation in each numbered paragraph above as if specifically set forth herein.

261.    On April 30, 2018, defendants terminated the employment of GONZALEZ with the CITY and his Civil Service career.

262.    The aforesaid termination is further retaliation in violation of 42 USC Sections 1981 and 1983 and NYCHRL, for both filing and prosecuting this lawsuit and for filing of a complaint with the New York City Department of Investigations in January 2017 in which GONZALEZ accused his superiors of corruption and violations of law.

263.    The aforesaid termination of GONZALEZ's employment was orchestrated by KIM, REILLY and COX as final municipal policy makers with regard to the termination decision of GONZALEZ's employment.

264.    Moreover, the termination is the final culmination of the failure of the CITY to properly train KIM, REILLY and COX in the proper handling of employment issues so as not to violate the civil and constitutional rights of employees in the Comptroller's Office, including GONZALEZ.

265.    By reason of the foregoing, Plaintiff has suffered loss and damage.

266.    Plaintiff demands a jury trial of all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following reliefs against the defendants:

a)   On the First Cause of Action, compensatory damages in the sum FIVE MILLION DOLLARS ($5,000,000.00);

b)   On the Second Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

c)   On the Third Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

d)   On the Fourth Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

e)   On the Fifth Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

f)   On the Sixth Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

g)   On the Seventh Cause of Action, compensatory damages in the sum of FIVE MILLION DOLLARS ($5,000,000.00);

h)   Punitive damages against the individual defendants as may be determined at trial;

i)   Permanent injunction to restrain the defendants by themselves, their servants and/or agents from continuing to discriminate and/or retaliate against GONZALEZ;

j)   Reasonable Attorneys' fees;

k)   Costs and disbursements of this action;

l)   Such further or other relief as to the court may see fit, just and equitable in the

circumstances.

Dated:      New York, New York
            April 27, 2019

**LAW OFFICES OF K.C. OKOLI, P.C**.
Attorneys for Plaintiff
EMILIO GONZALEZ
330 Seventh Avenue
15th Floor
New York, New York 10001
(212) 564-8152

By: _____/s/_____
    K.C. OKOLI, ESQ.

**<u>FOR SERVICE ON:</u>**

ZACHARY W. CARTER
Corporation Counsel of the City of New York
NYC Law Department
100 Church Street
New York, New York 10007
By: IVAN MENDEZ, JR., Senior Counsel
*Attorney for the City of New York*