USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/4/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

EMILIO GONZALEZ,                             :
                                             :
                              Plaintiff,     :
                                             :
                 -against-                   :                    1:17-cv-6518-GHW
                                             :
CITY OF NEW YORK, *et al.*,                  :                         ORDER
                                             :
                              Defendants. :

-------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

        Plaintiff Emilio Gonzalez worked in the New York City Comptroller's Office from 2002 to

2018.  In 2014, Gonzalez began to complain to his supervisors about what he perceived as

corruption in the Comptroller's Office.  Gonzalez was, nonetheless, promoted to Chief of the

Property Damage Division in February 2015.  Shortly after his promotion, Gonzalez testified that

one of his supervisors told him to fire an employee in the Property Damage division, Luc Pierre,

because Pierre is Black.  Gonzalez refused to do so.

        Gonzalez argues that his complaints about corruption and his refusal to fire Pierre inspired

his supervisors to instigate a retaliatory campaign against him.  Gonzalez was demoted from his

position as Division Chief of Property Damage in January 2016.  Gonzalez also faced disciplinary

charges before the New York City Office of Administrative Trials and Hearings.  The administrative

law judge who presided over the hearing concluded that Gonzalez was excessively absent and

insubordinate after his demotion.  Gonzalez was terminated from the civil service in 2018.

        Gonzalez brought this lawsuit alleging that his supervisors retaliated and discriminated

against him.  Because Gonzalez cannot demonstrate a causal connection between his protected

activity and the actions Gonzalez argues were retaliatory and because Gonzalez has not carried his

burden to show that the legitimate reasons offered by Defendants for their unfavorable actions

toward him were pretextual, Defendants' motion for summary judgment is GRANTED.

# I. BACKGROUND[1]

## A. Facts[2]

Gonzalez began working in the New York City Comptroller's Office as a Court Representative in the Bureau of Law and Adjustment ("BLA") in December 2002. Plaintiff's Response to Defendants' Rule 56.1 Statement ("56.1 Stmt"), Dkt No. 131, ¶ 11. Gonzalez was promoted to become a Senior Court Representative in 2011. *Id.* In December 2014, the Comptroller's Office posted a vacancy for the position of Division Chief of the Property Damage Division. *Id.* ¶ 15; Job Vacancy Notice for Property Damage Division, Ex. K to the Declaration of Ivan A. Mendez, Jr. ("Mendez Decl."), Dkt No. 126; First Deposition of Emilio Gonzalez ("Gonzalez Dep. I"), Ex. B to Mendez Decl., at 63:17-64:7. Gonzalez applied for and was awarded the position in February 2015. Gonzalez Dep. I at 62:16-25. Defendant Seunghwan Kim—who was Assistant Comptroller for BLA, *see* Deposition of Seunghwhan Kim ("Kim Dep."), Ex. I to Mendez Decl., at 14:12-16—approved Gonzalez's application for the Division Chief position. *Id.* at 47:15-23. As Assistant Comptroller for BLA, Kim supervised John Graham, the Director of Settlements and Adjudications in the BLA when Gonzalez was promoted to Chief of Property Damage. 56.1 Stmt ¶¶ 13, 22. Graham in turn supervised Gonzalez. *Id.* ¶ 21. Graham retired in July 2015 and was replaced by Defendant James Cox, who had previously served as Deputy Director of Settlements and Adjudications. *Id.* ¶¶ 22-23.

Shortly after he was promoted, Gonzalez alleges that Kim instructed him to terminate Luc Pierre—an employee in the Property Damage Division—because he is Black. *Id.* ¶ 19; Gonzalez

---

[1] For further background on this dispute, see the Court's prior opinion in this case. *Gonzalez v. City of New York* (*Gonzalez I*), 377 F. Supp. 3d 273 (S.D.N.Y. 2019).

[2] The facts are viewed in the light most favorable to Gonzalez because he is the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Unless otherwise noted, the following facts are undisputed.

Dep. I at 169:22-170:20; Declaration of Hope Lendzian ("Lendzian Decl."), Dkt No. 130, ¶¶ 5-7. Kim denies making that statement. Kim Dep. at 48:12-14.

### 1. Gonzalez's Application to the Deputy Director Position

In August 2015, the Comptroller's Office posted a job announcement for the Deputy Director position that Cox had vacated when he was promoted, and Gonzalez applied to that position. Gonzalez Dep. I at 168:10-13; Gonzalez's Application to Deputy Director Position, Ex. Q to Mendez Decl. The notice associated with that position stated that a candidate must have eighteen months in a supervisory capacity or "[e]ducation and/or experience" that was equivalent to 18 months in a supervisory capacity. Deputy Director Job Vacancy Notice, Ex. 8 to the Declaration of Kenechukwu Okoli ("Okoli Decl."), Dkt No. 132-8, at 1.

Gonzalez was interviewed for the Deputy Director position on September 9, 2015 by Cox, Kim, and Kathryn Diaz, who was serving as General Counsel in the Comptroller's Office. Interview Logs, Ex. R to Mendez Decl. In his notes on the interview, Cox noted that Gonzalez "[w]as not well prepared," that he "[d]id not handle questions well," and that he was not qualified for the position. Interview Logs at D003841.[3] Similarly, Kim wrote that Gonzalez was "[n]ot qualified" and that he "lack[ed] experience and judgment." *Id.* at D003840. Diaz observed that Gonzalez "[c]ould not articulate why [he was] ready for a second promotion [within] months [of his last promotion] and what lasting improvements [he has] made to [the] [P]roperty [D]amage [division]." *Id.* at D003838.

Gonzalez was not selected for the Deputy Director position. Selection Memo, Ex. T to Mendez Decl. Katherine Reilly—who had been serving as a Senior Court Representative—was selected for the job instead. *Id.* Reilly was interviewed by the same people who had interviewed

---

[3] Although Gonzalez disputes that the interview went poorly, he does not dispute the authenticity of the Interview Logs. *See* 56.1 Stmt at 10.

Gonzalez, and all three noted that she performed well during the interview. Interview Logs at D003837, D003839, D003841. A September 14, 2015 memorandum explaining her selection noted that Reilly "ha[d] over five years of experience working as an Associate for a private law firm" and that "[n]one of the other candidate[s] have such experience." Selection Memo at 1. Reilly became Gonzalez's supervisor as a result of her promotion. *See, e.g.*, Gonzalez Dep I at 75:10-12.

### 2. Gonzalez's Performance as Division Chief of the Property Damage Division

Gonzalez's supervisors testified that he struggled in his new role as Division Chief of the Property Damage Division. Cox testified that Gonzalez "struggl[ed] . . . to figure out how to process claims . . . timely and efficiently." Deposition of James Cox ("Cox Dep."), Ex. S to Mendez Decl., at 46:16-18. On September 22, 2015, Cox wrote a memorandum for his files documenting a conversation with Gonzalez in which he wrote that Gonzalez "missed the fact that the individual who filed the claim on behalf of herself had no standing to submit the claim." September 22, 2015 Memorandum, Ex. U to Mendez Decl. The Memorandum also states that Cox "warned [Gonzalez] that based on the recent requests by staff for transfers, the handling of [claim number] 2014PD036637 and the fact that he did not process over 300 settlements—that both the Assistant Comptroller and I have concerns about his performance as Chief of Property Damage." *Id.*

Reilly testified that she had "many conversations" with Gonzalez "about the process having been slowed down and that claims needed to be handled more expeditiously." Deposition of Katherine Reilly ("Reilly Dep."), Ex. J to Mendez Decl., at 49:15-18. Reilly further testified that "the work in the division slowed down to a crawl because of hurdles that Mr. Gonzalez was putting in the way of settling claims[.]" *Id.* at 45:13-16. In addition, "[t]he number of calls" received by the Property Division "from angry Claimants increased drastically" in part because "Gonzalez was unable to pacify Claimants when they called the Property Damage Division." *Id.* at 46:12-19. Reilly believed that "Gonzalez seemed unable . . . to make independent judgment calls" about which

claims warranted further investigation and which claims should be settled quickly. *Id.* at 81:3-5.

One problem with moving cases more slowly, Reilly noted, was that the statute of limitations for

claims would expire before claims examiners could respond to claimants. *Id.* at 101:13-18. Despite

the conversations between Reilly and Gonzalez about the need to resolve cases more quickly, Reilly

testified the problem "was only getting worse." *Id.* at 102:10.

Gonzalez asserts that he uncovered corruption in the Comptroller's Office as Division Chief

of the Property Damage Division. Gonzalez's principal complaint was that the Comptroller's Office

was "settling cases without determining liability or damages." Gonzalez Dep. I at 100:5-6. In a

declaration, Gonzalez further stated that he "refused to go along with Defendants' corrupt way of

settling claims without the necessary predicate of liability or standing of the Claimants." Declaration

of Emilio Gonzalez ("Gonzalez Decl."), Dkt No. 129, ¶ 14. Gonzalez testified that he was aware

that his supervisors in the Comptroller's Office were concerned that cases were not moving quickly

enough. Gonzalez Dep I at 75:10-12. However, Gonzalez believed that the cost of settlements

moving more slowly was justified by the savings that resulted from the new procedures that he

implemented. *Id.* at 76:13-77:12.

### 3. Gonzalez's Demotion and Prolonged Leaves of Absence

Cox, Reilly and Kim decided that "Gonzalez was not the right fit for" the Property Damage

Chief position. Reilly Dep. at 102:20. In January 2016, Gonzalez was demoted from his role as

Division Chief of the Property Damage Division to an administrative claims examiner, level one, in

the Motor Vehicle Claims Division. Demotion Letter, Ex. V to Mendez Decl. Gonzalez was

instructed to report to Defendant Maria Maglio-Scott, Division Chief of the Motor Vehicle

Division, for his new assignment. *Id.* Gonzalez's new duties included processing and opening mail,

summarizing police reports, and doing data entry. Gonzalez Dep. I at 122:4-6. Once he had the

documents necessary to evaluate a case, Gonzalez was instructed to report to Maglio-Scotti "about

settling cases." *Id.* at 122:6-9.  Gonzalez testified that Maglio-Scotti often commented on minor flaws in his work.  *Id.* at 122:13-17.

After his demotion, Gonzalez was absent from work for prolonged periods.  In an administrative proceeding before the New York City Office of Administrative Trials and Hearings (the "OATH Proceeding"), Administrative Law Judge Noel Garcia found that Gonzalez was absent on approved Family and Medical Leave Act ("FMLA") leave from May 9, 2016 to August 1, 2016.[4] Report and Recommendation of ALJ Garcia In the Matter of Office of the Comptroller Against Emilio Gonzalez ("OATH Decision"), Ex. F to Mendez Decl., at 7; *see also* Approval of Request for Leave Dated May 23, 2016, Ex. EE to Mendez Decl..  Gonzalez also requested, and received approval for, FMLA leave from August 2, 2016 to August 15, 2016.  56.1 Stmt ¶ 69 (citing Request for Special Leave, Ex. FF to Mendez Decl.).  Gonzalez testified that he was required to take this leave because he had aggravated a pre-existing back injury while moving boxes as directed by Maglio-Scotti in April 2016.  Gonzalez Dep. I at 130:16-131:14; Declaration of Emilio Gonzalez Dated July 13, 2018, Dkt No. 88, ¶¶ 5-11.

Not including this approved FMLA leave, ALJ Garcia found that Gonzalez was absent from work for 108 full days and 6 partial days in 2016.  OATH Decision at 7.  Gonzalez was also absent from work every workday in 2017 until the OATH Proceeding began on September 19, 2017.  *Id.* In total, Gonzalez was absent for a total of 180 workdays without authorization in 2016 and 2017. *Id.*  Including his approved FMLA leave, Gonzalez was absent from work for 288 workdays in 2016 and 2017.  *Id.* at 17.

On June 26, 2016—while on approved FMLA leave—Gonzalez was issued a citation for operating a jet ski "on a well-posted slow speed/manatee zone" in Miami Dade County in Florida.

---

[4] The parties dispute whether the Court should, or must, accept the factual findings of ALJ Garcia for purposes of this motion.  As discussed later in this opinion, because the Court concludes that ALJ Garcia's factual findings are entitled to preclusive effect, it discusses those findings here.

Uniform Boating Citation, Ex. GG to Mendez Decl.  Pursuant to the citation, Gonzalez paid a fine of $90 and a late fee of $20.  *Id.*  Gonzalez testified that he did not, in fact, operate a jet ski but rather that a stranger tossed him a line connected to the jet ski while he was standing on the dock and that, although he tried to explain that he had not been operating the jet ski, Florida police nonetheless issued him a citation.  Gonzalez Dep. I at 140:19-142:6.  However, Gonzalez asserts that he did not contest the citation because he decided it would be cheaper simply to pay the fine. *Id.* at 142:7-21.  Evaluating the evidence of the incident, ALJ Garcia found that Gonzalez's "actions in operating a personal watercraft in Florida while out on approved FMLA leave due to a purported injury suggests dishonesty and was conduct tending to bring the City or the Office of the Comptroller into disrepute and conduct prejudicial to good order and discipline in violation of Rules 3(S) and 3(R) of the Comptroller's rules."  OATH Decision at 17.

On August 16, 2016, Gonzalez requested a third leave of absence under the FMLA.  Request for Special Leave, Ex. HH to Mendez Decl.  That request was denied.  Leave Denial Letter, Ex. II to Mendez Decl.  The letter denying Gonzalez's request for leave stated that he was required to report to work on August 29, 2016 or he would be deemed absent without leave ("AWOL").  *Id.*

### 4. Gonzalez's Application for the Senior Court Representative Position

On November 15, 2016, the Comptroller's Office posted a vacancy for an open Senior Court Representative position.  Senior Court Representative Job Posting, Ex. PP to Mendez Decl. Gonzalez applied for this position on November 20, 2016.  Gonzalez's Application for Senior Court Representative, Ex. QQ to Mendez Decl.  However, because of Gonzalez's "excessive absenteeism," he "was not considered a good candidate for the position[.]"  Declaration of Seunghwan Kim ("Kim Decl."), Dkt No. 124, ¶ 6.  Consequently, Gonzalez was not interviewed for the senior court representative position.  *Id.*

### 5. Gonzalez's Complaints

Gonzalez testified that he first complained of improprieties with respect to the settlement of claims in the School Claims Division before he was promoted to Division Chief of the Property Damage Division. Gonzalez Dep. I at 101:8-102:8. However, Gonzalez did not report these improprieties to the Department of Investigations ("DOI") until approximately two years later. *Id.* at 105:3-16. Gonzalez also testified that the first time he lodged complaints about improprieties concerning the settlement of cases in the Property Damage Division was between late July and early August 2015. *Id.* at 105:25-106:11.

On September 21, 2016, Gonzalez filed a document he styled as an "Internal Grievance – Complaint" (the "Internal Grievance"). Internal Grievance, Ex. 22 to Okoli Decl., Dkt No. 132-22. The Internal Grievance was addressed to Equal Employment Opportunity ("EEO") Counselor Jose Quiroz, Comptroller Scott Stringer, First Deputy Comptroller Alaina Gilligo, and Chief of Staff to the Comptroller, Sascha Owen. *Id.* at 1. In the Internal Grievance, Gonzalez complained that he had been "denied a . . . reasonable accommodation for time out of the office to continue necessary medical treatment for [his] disabilities and that denial was discriminatory in nature and retaliatory[.]" *Id.* at 1. The Internal Grievance also asserted that Gonzalez was

> wrongfully removed from a leadership position as Division Chief of the Property Damage Division with a salary reduction as punishment for . . . refus[ing] to rapidly settle claims where appropriate investigations had not been completed and where questions of standing and/or liability and/or the valuation of appropriate damages had not yet been resolved or otherwise determined, . . . refus[ing] to expend, approve or otherwise authorize the payment of taxpayer monies on uninvestigated/haphazardly investigated claims and for refusing to breach [his] fiduciary duty to the taxpayers of the City of New York, . . . refus[ing] to take part in a de-facto scheme to buy taxpayer votes . . . refus[ing] to contribute to or otherwise partake in a pattern and practice of the bureau that knowingly inflated, permitted, caused, encouraged, pressured employees into the inflation of, the manipulation of and/or turned a blind eye to the inflation of or the manipulation of the number of claim dispositions reported in order to make or meet quotas and publish high disposition values in the reports they created including, but not limited to, yearly claims reports, and the claim statistics . . . [and] [s]afeguarding the fiscal health of the city, by creating policies and protocols to root out waste, fraud and abuse found in claims submitted to the [the Property Damage]

division[.]

*Id.* at 2.  In addition, the Internal Grievance claimed that Gonzalez had been retaliated against for "scrutinizing [Property Damage] claims that" were submitted by politically connected claimants or were the subject of media coverage.  *Id.*

The Internal Grievance also claimed that Gonzalez "was discriminated against by virtue of the hiring and/or promoting practices of [the Comptroller's Office] . . . based on color, creed, ethnicity, national origin and/or age[.]"  *Id.*  Finally, Gonzalez asserted in the Internal Grievance claimed that he was subjected to a hostile work environment by Maglio-Scotti.  *Id.* at 3.  The Comptroller's EEO Office interviewed multiple individuals in the Comptroller's Office and reviewed relevant documents.  EEO Report, Ex. TT to Mendez Decl.  After concluding its investigation, the EEO office issued a memorandum concluding that Gonzalez's allegations of discrimination were unsubstantiated.  *Id.* at D001149.  First Deputy Comptroller Gigllio approved the report and its findings on January 5, 2017.  Memorandum Regarding EEO Report, Ex. UU to Mendez Decl.

On November 7, 2016, Gonzalez filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), attaching the Internal Grievance.  EEOC Charge, Ex. M to Mendez Decl.  On January 13, 2017, Gonzalez filed a complaint with the New York City Department of Investigation ("DOI") that outlined similar claims.  DOI Claim, Ex. O to Mendez Decl.  Andrew Sein, the Inspector General of DOI, subsequently sent a "Complaint Referral" to Diaz (the "DOI Referral").  Ex. WW to Mendez Decl.  The DOI Referral noted that DOI had received allegations concerning BLA.  *Id.* at 1.  The allegations as described by Sein in the DOI Referral generally mirror the claims made by Gonzalez in the Internal Grievance.  *Id.* at 1-2.

Diaz responded to the DOI Referral in a letter to Sein.  Response to DOI Referral, Ex. XX to Mendez Decl.  Diaz noted that with respect to motor vehicle claims, "BLA requires specific

written information be provided by the claimant, including the name of the person filing and his or her relationship to the claimant, the name of the owner of the vehicle, the make, model, and year of the vehicle, as well as the plate and vehicle identification number" and that "[p]ayment to an individual other than the vehicle owner requires written authorization by the vehicle owner." *Id.* at 1-2. With respect to claims for property damage, Diaz wrote that BLA requires "specific written information be provided by the claimant, including a description of the manner in which the claim arose and an itemized list of the damage claimed, including the dollar amounts." *Id.* at 3. Regarding roadway damage claims and claims involving the Department of Education, Diaz stated that "BLA requires specific written information be provided by the claimant, including the date of the incident, the time of the incident, the location of the incident, and a description of the manner in which the claim arose and the items of damage claimed, including the dollar amounts." *Id.* Diaz confirmed that these policies were "followed on a consistent basis." *Id.* at 1-3. There is no evidence in the record to suggest that DOI took any further action based on the DOI Referral.

### 6. The OATH Proceeding

On February 13, 2017, Gonzalez was served with a Notice of Informal Conference and Statement of Charges which stated that the Comptroller's Office was initiating a proceeding against Gonzalez before OATH. OATH Charges, Ex. YY to Mendez Decl. Gonzalez was charged with "(1) excessive absenteeism; (2) failure to comply with the Comptroller's Office time and leave procedures; (3) making a false entry in his timekeeping records; (4) engaging in insubordinate behavior; (5) engaging in conduct tending to bring the City or the Comptroller's Office in disrepute (related to his operation of a watercraft while out on medical leave); (6) making false statements in his DOI background questionnaire and Comprehensive Personnel Document; and (7) misrepresenting his credentials in two job applications." 56.1 Stmt ¶ 98 (citing OATH Charges). As a part of the OATH Proceeding, Gonzalez's counsel served discovery requests on the Comptroller's

Office.  Discovery Requests, Ex. ZZ to Mendez Decl.  The Comptroller's Office turned over some relevant documents in response to Gonzalez's discovery requests but objected to some of Gonzalez's requests.  Discovery Responses, Ex. AAA to Mendez Decl.

Gonzalez was represented by counsel throughout the OATH Proceeding.  *See generally* Transcript of OATH Proceeding ("OATH Tr."), Ex. E to Mendez Decl.  Gonzalez also testified on his own behalf and presented two witnesses.  OATH Tr. at 146:3-149:13; 165:15-257:3.  In addition, Gonzalez introduced evidence, objected to the introduction of certain defense evidence, and cross-examined government witnesses.  *See generally id.*  Gonzalez's attorney also submitted a post-trial brief.  OATH Post-Hearing Brief, Ex. CCC to Mendez Decl.  Nonetheless, Gonzalez later testified that he believed the OATH Proceeding was a "sham."  Gonzalez Dep. I at 145:4-5.

On April 13, 2018, ALJ Garcia issued a report and recommendation which sustained the majority of the disciplinary charges against Gonzalez and recommended Gonzalez's termination.  OATH Decision at 16-18.  ALJ Garcia sustained the charges regarding Gonzalez's excessive absenteeism, falsification of a timesheet, and travel to Florida and operation of a jet ski while on FMLA leave among others.  *Id.* at 16-17.  ALJ Garcia recommended Gonzalez's termination based on these charges.  *Id.* at 17-18.  On April 30, 2018, First Deputy Comptroller Gilligo adopted ALJ Garcia's report and recommendation and terminated Gonzalez's employment.  Termination Letter, Ex. EEE to Mendez Decl.

### B. Procedural History

Gonzalez filed his initial complaint in this case on August 25, 2017, Dkt No. 1, and filed an amended complaint on December 7, 2017, Dkt No. 33.  Defendants filed a motion to dismiss the amended complaint on March 9, 2018.  Dkt No. 44.  Gonzalez filed a second amended complaint on April 18, 2018, Dkt No. 53, and a third amended complaint on June 1, 2018, Dkt No. 76.  Defendants filed a motion to dismiss the third amended complaint ("TAC") on June 21, 2018.  Dkt

No. 84.  In the TAC, Gonzalez alleged claims for discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), and the New York City Human Rights Law ("NYCHRL").

The Court granted Defendants' motion to dismiss in part and denied it in part in *Gonzalez I*. The Court dismissed Gonzalez's claims under Section 1981 with prejudice because applicable precedent barred Gonzalez "from asserting claims under § 1981 against the Individual Defendants in their individual capacities." *Gonzalez I*, 377 F. Supp. 3d at 285.[5]  The Court also dismissed Gonzalez's Section 1983 claims against the City and the Individual Defendants in their official capacities because Gonzalez had not plausibly alleged that his rights were violated as a result of a "policy or custom" as required for municipal liability under Section 1983.  *Id.* at 285-87.  However, the Court granted Gonzalez leave to replead his Section 1983 claims against the City and the Individual Defendants in their official capacities.  *Id.* at 286-87.

The Court dismissed Gonzalez's discrimination claims under Section 1983.  *Id.* at 288.  The Court dismissed Gonzalez's claims for disability discrimination with prejudice because "[c]laims of disability discrimination are not actionable under § 1983."  *Id.*  The Court also dismissed Gonzalez's claims for age and race discrimination because Gonzalez failed to allege that the Individual Defendants were personally involved in the alleged deprivations of his constitutional rights.  *Id.* at 289.  The Court granted Gonzalez leave to replead his age and race discrimination claims.  *Id.*  The Court likewise dismissed Gonzalez's discrimination claims under the NYCHRL but granted Gonzalez leave to replead his age, race, and disability discrimination claims under that statute.  *Id.* at 299-301.

The Court denied Defendants' motion to dismiss Gonzalez's retaliation claims under Section

---

[5] As in *Gonzalez I*, this opinion refers to Kim, Cox, Reilly, and Maglio-Scotti collectively as the "Individual Defendants."

1983. With respect to Gonzalez's retaliation claims under the Fourteenth Amendment, the Court held that Gonzalez had plausibly alleged a causal connection between his protected activity and the adverse employment actions that he suffered. *Id.* at 290-293. With respect to Gonzalez's First Amendment retaliation claims, the Court held that it could not determine, at the motion to dismiss stage, whether Gonzalez was speaking as a citizen or as an employee and thus could not dismiss those claims. *Id.* at 293-95. Because the Court concluded that Gonzalez's Section 1983 retaliation claims survived Defendants' motion to dismiss, it also denied Defendants' motion to dismiss Gonzalez's retaliation claims under the NYCHRL, as the NYCHRL applies a more plaintiff-friendly standard. *Id.* at 301-02. The Court also dismissed Gonzalez's hostile work environment claims under Section 1983 and the NYCHRL and his claims that his due process rights were violated but granted Gonzalez leave to replead all of these claims. *Id.* at 296-299; 302.

Gonzalez filed the fourth amended complaint ("FAC") on April 27, 2019. Dkt No. 110. The FAC asserts seven claims for relief. The first cause of action asserts a claim under Section 1983 because Defendants allegedly retaliated against Gonzalez for refusing to fire Pierre by declining to hire him for the Deputy Director position. FAC ¶¶ 198-209. The second cause of action asserts claims under Section 1981, Section 1983, and the NYCHRL because Defendants allegedly retaliated against Gonzalez for refusing to fire Pierre by demoting him from his position as Division Chief of the Property Damage Division. *Id.* ¶¶ 210-16. The third cause of action asserts claims under Section 1983 and the NYCHRL because Defendants allegedly retaliated against Gonzalez for exercising his First Amendment rights and for refusing to fire Pierre by refusing to interview Gonzalez for the Senior Court Representative position. *Id.* ¶¶ 217-24. The fourth cause of action alleges claims under Section 1983 and the NYCHRL because Defendants allegedly retaliated against Gonzalez for raising complaints about practices within the Property Damage Division by terminating Gonzalez from the civil service. *Id.* ¶¶ 225-36.

The fifth cause of action asserts claims under Section 1983 and the NYCHRL because Defendants allegedly discriminated against Gonzalez and violated his due process rights. *Id.* ¶¶ 237-54. This claim asserts hostile work environment and disability discrimination under the NYCHRL because Gonzalez was allegedly required by Maglio-Scotti to move boxes despite his neck and back injuries. *Id.* ¶¶ 240-41. The claim also asserts that Defendants' refusal to consider Gonzalez for leave without pay is a denial of Gonzalez's due process rights and constitutes disability discrimination. *Id.* ¶ 251. The sixth cause of action alleges claims under Section 1983 and the NYCHRL for constructive discharge. *Id.* ¶¶ 255-59. The seventh cause of action asserts claims under Section 1983 and the NYCHRL because Defendants allegedly retaliated against Gonzalez for filing the DOI complaint and this lawsuit by terminating him from the civil service. *Id.* ¶¶ 260-66.

Defendants filed their motion for summary judgment on September 12, 2019. Dkt Nos. 122-26. Gonzalez filed his opposition on November 4, 2019. Dkt Nos. 129-33. Defendants filed their reply on December 3, 2019. Dkt Nos. 139-41.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.") (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III. DISCUSSION[6]

### A. Claims Previously Dismissed by the Court

In *Gonzalez I*, the Court dismissed Gonzalez's claims under Section 1981 with prejudice. 377 F. Supp. 3d at 288. Gonzalez nonetheless included such a claim in the FAC. *See* FAC at 40. Gonzalez also failed to respond to Defendants' arguments that summary judgment should be granted because the Court previously dismissed his Section 1981 claims with prejudice. Gonzalez has thus abandoned his Section 1981 claims. *See Martinez v. City of New York*, No. 11 CIV. 7461 JMF, 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (quotation omitted). Because the Court previously dismissed these claims with prejudice and Gonzalez has abandoned these claims, Defendants are entitled to summary judgment on Gonzalez's Section 1981 claims.

The Court similarly dismissed Gonzalez's claims for disability discrimination under Section 1983 with prejudice because "[c]laims of disability discrimination are not actionable under § 1983." *Gonzalez I*, 377 F. Supp. 3d at 288 (citing *Bd. of Trs. v. Garrett*, 531 U.S. 356, 368 (2001)). The FAC states a claim for disability discrimination, *see* FAC at 43, but the FAC is not clear whether this claim is stated under federal or local law. To the extent that Gonzalez stated a claim for disability discrimination under Section 1983 in the FAC, Gonzalez has likewise abandoned that claim. *See* Opposition to Motion for Summary Judgment ("Opp."), Dkt No. 133, at 13 (arguing that Defendants committed "disability discrimination under the NYCHRL") (capitalization altered). Hence, to the extent that Gonzalez intended to state a claim for disability discrimination under Section 1983, the Court grants summary judgment to Defendants on that claim.

---

[6] Because the Court ultimately declines supplemental jurisdiction over Gonzalez's NYCHRL claims, it does not address those claims.

The Court also dismissed Gonzalez's age and race discrimination claims in *Gonzalez I*, but it dismissed these claims without prejudice. 377 F. Supp. 3d at 288-89. In the FAC, Gonzalez does not assert a Title VII claim, or any other claim for age or race discrimination under federal law. In the FAC, Gonzalez asserts that Defendants discriminated against him by creating a hostile work environment based on his race. FAC ¶ 251. However, in his opposition, Gonzalez clarified that his claim for hostile work environment discrimination is limited to a claim under the NYCHRL. Opp. at 13. Because Gonzalez is represented by counsel in this proceeding, the Court evaluates only the claims for relief expressly presented in the FAC. The Court does not construe Gonzalez's submissions "liberally and interpret them to raise the strongest arguments that they suggest," *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999) (quotations omitted), as it would with a *pro se* litigant. Furthermore, the Court is now considering Gonzalez's fourth amended complaint, so Gonzalez has had ample opportunity to amend his complaint to assert federal discrimination claims yet has chosen not to do so. Thus, although Gonzalez makes allegations that may be construed as alluding to a claim for age or race discrimination, *see, e.g.*, FAC ¶¶ 186, 189, 220-21, the Court does not address federal discrimination claims because Gonzalez's pleadings and subsequent submissions show that he is no longer pursuing such claims. And because the Court ultimately declines supplemental jurisdiction over Gonzalez's claims under local law, including the NYCHRL, it does not address Gonzalez's claims for discrimination under local law.[7]

The Court similarly dismissed Gonzalez's claims against the City and the Individual Defendants acting in their official capacities without prejudice in *Gonzalez I*. 377 F. Supp. 3d at 285-

---

[7] The Court notes that Gonzalez's testimony in his deposition that Kim instructed him to terminate Pierre because Pierre is Black, Gonzalez Dep. I at 170:9-20, and that Maglio-Scott commented that "now the fucking Puerto Ricans are taking over" when Gonzalez was put "in charge" of all of the Court Representatives, *id.* at 223:22-224:8, may have been sufficient evidence to preclude summary judgment for Defendants on a federal race discrimination claim. However, because Gonzalez did not assert a federal claim for racial discrimination in the FAC, the Court does not take a position on that question.

87.  As explained in *Gonzalez I*,

> [u]nder § 1983, municipalities are not vicariously liable for their employees' actions. Plaintiffs seeking to hold a municipality liable under § 1983 must plead (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.
>
> A plaintiff may satisfy the policy or custom prong in one of four ways:  by alleging the existence of 1) a formal policy; 2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; 3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or 4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.  Furthermore, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.

*Id.* at 286 (quotations and citations omitted).  Again, Gonzalez abandoned these claims because he did not address Defendants' arguments for summary judgment in his opposition.

The only evidence Gonzalez has offered to support an argument for municipal liability in this case is evidence about the roles held by the Individual Defendants.  Where the contention is not that the defendants' actions were taken pursuant to a formal policy, but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority.  *See  St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.").  The burden is on Gonzalez to establish that an Individual Defendant is a final policymaker as a matter of law.  *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Praprotnik*, 485 U.S. at 123-25 (1988).  "Where a city official 'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy."

*Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Gonzalez has not offered evidence to create a triable issue of fact as to whether any of the Individual Defendants had final policymaking authority. None of the Individual Defendants had final authority over any significant matters; rather, all Defendants ultimately reported to the Comptroller. For that reason and because Gonzalez abandoned his municipal liability claims in his opposition, Defendants are entitled to summary judgment on Gonzalez's Section 1983 claims against the City and the Individual Defendants in their official capacities.

The Court similarly dismissed Gonzalez's due process claims in *Gonzalez I* without prejudice. 377 F. Supp. 3d at 299. In the FAC, Gonzalez renews his argument that Defendants denied him due process. Gonzalez appears to assert three arguments in support of this claim. First, Gonzalez argues that Defendants failed to follow the Comptroller's policies for absent employees as outlined in the Comptroller employee handbook. Opp. at 14; *see* Employee Manual Rules and Procedures, Ex. 27 to Okoli Decl., Dkt No. 132-27, at 3 (outlining the absence policy). Second, Gonzalez argues generally that the OATH proceeding was unfair to him. Opp. at 14-18. Third, Gonzalez argues that Defendants' refusal to consider him for leave without pay for his disability is a denial of Gonzalez's due process rights. FAC ¶ 251.

With respect to the first ground, even if it is true that Defendants failed to follow the internal absence policy, this does not constitute a violation of Gonzalez's due process rights. The failure to follow an internal Comptroller's Office employment procedure does not give rise to a claim for a due process violation. *Cf. Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim.").

With respect to the second ground, the purported deficiencies identified in the OATH

proceeding also do not permit Gonzalez to defeat Defendants' motion for summary judgment. As noted above, a review of the transcript of the OATH proceedings shows that Gonzalez received a full and fair opportunity to litigate his claims. *See generally* OATH Tr. In any event, Gonzalez could have raised any objections to the OATH proceedings in a subsequent proceeding in New York state court under Article 78 of New York's Civil Practice Law and Rules. "Employees can obtain judicial review of adverse disciplinary determinations under article 78 of New York's Civil Practice Law and Rules." *Gonzalez v. City of New York*, No. 1:18-CV-2197-GHW, 2020 WL 158432, at *1 (S.D.N.Y. Jan. 13, 2020). The availability of an article 78 proceeding is sufficient to satisfy the requirements of due process. *See Locurto v. Safir*, 264 F.3d 154, 173-75 (2d Cir. 2001) (holding that an article 78 proceeding constitutes "wholly adequate post-deprivation" process); *see also Gonzalez v. City of New York*, No. 1:18-CV-02197-GHW, 2018 WL 10323053, at *7 (S.D.N.Y. Dec. 18, 2018); *Mordukhaev v. Daus*, 457 F. App'x 16, 21 (2d Cir. 2012) ("[W]e have held that the availability of an Article 78 proceeding to challenge any alleged deficiencies in an administrative adjudication is sufficient to satisfy due process.") (citations omitted). Hence, Gonzalez cannot state a viable due process claim for alleged violations of his rights that occurred during the OATH Proceeding.

With respect to the third ground, the decision not to consider Gonzalez for additional unpaid leave is not a denial of his due process rights. Gonzalez argues that, notwithstanding the fact that he had exhausted his FMLA leave, he "would have been entitled to consideration for such leave of absence without pay pursuant to Civil Service Law, Sections 71 and 72." FAC ¶¶ 246-47. But, as the Second Circuit has explained in rejecting a similar claim, "Section 72 does not create an entitlement because it provides a *discretionary* course of action for employers[.]" *Jannsen v. Condo*, 101 F.3d 14, 16 (2d Cir. 1996). Because "[t]his section does not mandate the employer to grant a leave of absence and a corresponding hearing, but rather permits the procedure," Gonzalez did not have a due process right to be considered for leave without pay under those sections. *Id.* Therefore, it was

not a denial of Gonzalez's due process rights for Maglio-Scotti to refuse to consider him for leave without pay under those sections.  Consequently, the Court grants summary judgment to Defendants on Gonzalez's due process claims.

**B. Section 1983 Retaliation Claims Against the Individual Defendants in Their Individual Capacities**

Gonzalez asserts several claims for retaliation against the Individual Defendants in their individual capacities in violation of Section 1983.  The FAC alleges that Defendants retaliated against Gonzalez for refusing to fire Pierre by refusing to promote him to the position of Deputy Director and demoting him from his position as Chief of Property Damage.  FAC ¶¶ 198, 215.  The FAC further alleges that Defendants retaliated against him for refusing to fire Pierre and for filing complaints about practices in the Comptroller's Office by failing to interview him for the Senior Court Representative position in November of 2016.  *Id.* ¶ 223.  Gonzalez also alleges that Defendants retaliated against him for submitting the DOI Claim by filing disciplinary charges against him and initiating the OATH Proceeding.  *Id.* ¶ 226.  Finally, Gonzalez alleges that Defendants retaliated against him for submitting the DOI Claim and initiating this lawsuit by terminating him from the civil service.  *Id.* ¶ 262.

### 1. Legal Standard

To survive summary judgment on a Section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988) (citation omitted).  It is not disputed that the Individual Defendants were acting under color of state law; thus, the issue in this case is whether Gonzalez can show a constitutional or statutory violation.

Most of Gonzalez's retaliation claims under Section 1983 "are analyzed pursuant to Title VII

principles."[8] *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996)). "Retaliation claims . . . are evaluated under a three-step burden-shifting analysis" established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Hicks*, 593 F.3d at 164 (quotation omitted); *see also Holcomb v. State Univ. of New York at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017) ("Retaliation claims under Title VII, as well as under Title IX, Section 1983, and the NYSHRL, are evaluated under the three-step burden-shifting analysis from *McDonnell Douglas Corp. v. Green*."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012) ("To survive a motion for summary judgment, a plaintiff claiming discrimination under Title VII, the NYSHRL, and § 1983 must satisfy the tripartite burden-shifting test enumerated in *McDonnell Douglas Corp. v. Green*.").

Under the *McDonnell Douglas* framework, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (quotation omitted); *see also Gonzalez I*, 377 F. Supp. 3d at 290. An employment action is considered adverse if "the employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "A plaintiff can demonstrate a causal connection (a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." *Antonmarchi v. Consol. Edison Co. of New York*, No. 03CIV7735LTSKNF, 2008 WL

---

[8] As noted below, Gonzalez asserts a claim for First Amendment retaliation that is analyzed according to a different framework.

4444609, at *8 (S.D.N.Y. Sept. 29, 2008) (quotation omitted). "The plaintiff's burden in this regard is *de minimis,* and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164 (quotation omitted).

"If the plaintiff sustains this initial burden, a presumption of retaliation arises." *Id.* (quotation omitted). Thus, at the second step of the burden-shifting framework, the "defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (quotation omitted). "An employer sustains its burden 'by producing *any evidence* of nondiscriminatory reasons, whether ultimately persuasive or not.'" *Antonmarchi*, 2008 WL 4444609, at *8 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "The employer need not prove by a preponderance of the evidence that the reasons for his action were not discriminatory, but may simply present clear and specific reasons for the action." *Id.* (quoting *Gibbs v. Consol. Edison Co.*, 714 F. Supp. 85, 89 (S.D.N.Y. 1989)).

"If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case, such that at the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (quotation and brackets omitted); *see also Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (holding that at the third stage of the *McDonnell Douglas* framework, an employee must produce evidence "to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "An employer's reason for [an adverse employment action] cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.

1995) (citing *Hicks*, 509 U.S. at 515). In sum, under the *McDonnell Douglas* framework, "[a] plaintiff

must establish a prima facie case; the employer must offer through the introduction of admissible

evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then

produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v.*

*CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citation omitted).

### 2. Application

#### a. Failure to Promote

In the first cause of action alleged in the FAC, Gonzalez alleges that Defendants retaliated

against him for refusing to fire Pierre by failing to promote him to the Deputy Director position.

FAC ¶ 198. Gonzalez has also submitted a declaration in which he attests that Kim requested that

he fire Pierre and that he refused to do so. Gonzalez Decl. ¶ 8; *see also* Lendzian Decl. ¶¶ 5-7. Kim

denies making that statement, Kim Dep. 48:12-14, but at this stage, the Court cannot resolve

disputed issues of fact and views the record in the light most favorable to Gonzalez.

As the Court held in *Gonzalez I*, the refusal to fire Pierre constituted protected activity. 377

F. Supp. 3d at 291 ("The Court agrees that Mr. Gonzalez has alleged that he engaged in protected

activity by refusing to comply with Mr. Kim's order[.]") (citing *Vega v. Hempstead Union Free Sch. Dist.*,

801 F.3d 72, 91 (2d Cir. 2015)). It is also undisputed that Gonzalez was not selected for the

position, which is an adverse employment action. *Cf. Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.

2002) ("Adverse employment actions include discharge, refusal to hire, refusal to promote,

demotion, reduction in pay, and reprimand.") (citation omitted).

Gonzalez has failed to prove a causal connection between his failure to fire Pierre and

Defendants' failure to promote him to the Deputy Director position. "[C]ourts in this Circuit have

consistently held that the passage of two to three months between the protected activity and the

adverse employment action does not allow for an inference of causation." *Wang v. Palmisano*, 157 F.

Supp. 3d 306, 328 (S.D.N.Y. 2016) (citation omitted). Gonzalez testified that Kim instructed him to fire Pierre in February 2015, shortly after he was promoted to his position as Chief of the Property Damage Division. Gonzalez Dep. I at 62:16-25. Defendants did not refuse to promote Gonzalez to the Deputy Director position until September of 2015—more than six months after he refused to fire Pierre. Selection Memo at 1. Thus, because Gonzalez identified his refusal to fire Pierre as the predicate for his failure to promote retaliation claim, Gonzalez has not presented sufficient evidence from which a rational factfinder could infer a causal relationship between his failure to fire Pierre and a failure to promote him to the Deputy Director position.

Even assuming that Gonzalez had proven a causal relationship between his failure to fire Pierre and Defendants' failure to promote him to the Deputy Director position, Gonzalez's retaliation claim would still fail at the third step of the *McDonnell Douglas* framework. Assuming *arguendo* that Gonzalez satisfied his initial burden under the *McDonnell Douglas*, the burden shifts back to Defendants to offer a legitimate, non-discriminatory reason for their refusal to promote Gonzalez. Defendants have carried that burden by submitting evidence showing that Gonzalez was not promoted because Gonzalez performed poorly at his interview and seemed unprepared for the job. *See* 56.1 Stmt ¶¶ 25-29 (citing Interview Logs at D003842; Cox Dep. at 99:21-100:5; Kim Dep. at 111:9-112:13). For example, Cox wrote that Gonzalez "[w]as not well prepared" and that he "[d]id not handle questions well." Interview Logs at D003841. Similarly, Diaz wrote that Gonzalez "[c]ould not articulate why [he was] ready for a second promotion [within] months [of his last promotion] and what lasting improvements [he has] made to [the] [P]roperty [D]amage [division]." *Id.* at D003838. Gonzalez's poor interview performance and lack of preparedness for the position, as documented by the evidence submitted by Defendants, provide legitimate, non-discriminatory reasons for Defendants to refuse to promote Gonzalez.

At the third step of the *McDonnell Douglas* framework, Gonzalez must offer evidence to show

25

that the reason for Defendants refusal to promote him was pretextual; that is, Gonzalez must show that Defendants' reasons are "false *and* that [retaliation] was the real reason." *Quarantino*, 71 F.3d at 64 (citation omitted). Gonzalez has not offered evidence sufficient to carry this burden. Gonzalez disputes that he was unprepared for, or otherwise performed poorly at, the interview but this, by itself, does not suggest pretext. Indeed, Gonzalez does not dispute that—according to contemporaneous notes made at the time of the interview—all three of his interviewers determined that he performed poorly. 56.1 Stmt at 10-12.

Gonzalez argues that the fact that the Comptroller's office hired Katherine Reilly for the Deputy Director position is evidence of pretext. All three of Reilly's interviewers wrote that she seemed prepared and performed well during the interview. *See* 56.1 Stmt ¶¶ 30-35 (citing, *inter alia*, Interview Logs at D003837, D003839, D003841; Selection Memo). Again, Gonzalez does not dispute the authenticity of the Interview Logs. Instead, he argues that Reilly "did not have the requisite 18 months supervisory experience" that were, according to Gonzalez, necessary for a candidate to be interviewed for the position. However, this argument is contradicted by the Job Vacancy Notice on which Gonzalez relies. That notice states that a candidate must have eighteen months in a supervisory capacity *or* "[e]ducation and/or experience" that was equivalent to 18 months in a supervisory capacity. Job Vacancy Notice at 1. Thus, there is no merit to Gonzalez's claim that Reilly did not possess the minimum qualifications for the position, and Gonzalez's only argument for the proposition that the decision to promote Reilly to the Deputy Director position was retaliatory falls flat.

Moreover,

[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the

exercise of impartial judgment, could have chosen the candidate selected over the
plaintiff for the job in question.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quotation omitted), *superseded*

*in part and on other grounds by* Fed. R. Civ. P. 37(e); *see also Szewczyk v. Saakian*, 774 F. App'x 37, 40 (2d

Cir. 2019) (quoting *Byrnie*, 243 F.3d at 103).   Gonzalez's argument that the decision to demote him

was pretextual rests entirely on the premise that "Ms. Reilly should not have been interviewed since

she did not possess the published minimum qualification for the job—18 months supervisory

responsibility."  Opp. at 12.  This does not come close to meeting Gonzalez's burden to show that

his credentials were so superior to Reilly's that no reasonable person could have chosen Reilly over

Gonzalez.  Indeed, the Selection Memo notes that Reilly "ha[d] over five years of experience

working as an Associate for a private law firm" and that "[n]one of the other candidate[s] have such

experience."  Selection Memo at 1.

In his opposition, Gonzalez did not argue that the order to fire Pierre itself or Maglio-

Scotti's comment that "the fucking Puerto Ricans are taking over" is evidence that Defendants'

reasons for failing to promote him were pretextual.  Because Gonzalez did not present this

argument, it is waived.  *See Bd. of Managers v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 39 (E.D.N.Y.

2011) (holding that arguments not raised in briefing are "generally deemed waived").  Even if

Gonzalez had raised this argument, "isolated and stray remarks, without more, are insufficient to

raise an inference of retaliation."  *Alexander v. Bd. of Educ.*, 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015)

(citation omitted).

Furthermore, the temporal gap between these actions and Defendants' failure to promote

Gonzalez undercuts the argument that Defendants' reasons for failing to promote him were

pretextual.  As noted above, six months elapsed between Gonzalez's refusal to fire Pierre and

Defendants' failure to promote Gonzalez.  Although Gonzalez did not give a precise date for

Maglio-Scotti's comments, he testified that these comments occurred before he was promoted to

Chief of the Property Damage Division. Gonzalez Dep. I at 223:16-224:8. The fact that Gonzalez was promoted following these comments, together with the gap in time further undermines the argument that Defendants' reasons for failing to promote Gonzalez were pretextual. *Cf. El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . ., but without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext."). Thus, Gonzalez has not carried his burden to present evidence that the reasons provided by Defendants for their failure to promote him to the Deputy Director position were false *or* that the real reason was retaliatory animus. *Cf. Quarantino*, 71 F.3d at 64 (requiring that a plaintiff show that a defendant's reasons were "false *and* that [retaliation] was the real reason" to meet her burden to show pretext) (citation omitted). Accordingly, Gonzalez has not shown that Defendants' reasons for failing to promote him were pretextual, and Defendants are entitled to summary judgment on Gonzalez's first claim in the FAC.

### b. Demotion

In his second claim for relief, Gonzalez alleges that he was demoted from his position as Division Chief because he refused to fire Pierre. *See* FAC ¶ 215. As noted above, Gonzalez's refusal to fire Pierre was a protected activity and his demotion was an adverse employment action.

Gonzalez has again failed to set forth facts that suggest a causal connection between his demotion and his refusal to fire Pierre. Gonzalez's demotion occurred in January 2016, *see* Demotion Letter at 1, which was more than eleven months after he refused to fire Pierre. This temporal gap does not permit an inference of a causal connection between the protected activity alleged in the complaint as the basis for Gonzalez's retaliation claim in his second claim for relief and Gonzalez's demotion.

Gonzalez' retaliation claim fails for the additional reason that he has not shown that

Defendants' reasons for demoting him were pretextual. Again assuming *arguendo* that Gonzalez had satisfied his initial burden of proving a *prima facie* case of retaliation, the burden shifts back to Defendants to articulate a legitimate, non-discriminatory reason for their decision to demote him. Defendants have carried that burden by offering evidence that Gonzalez performed poorly as Division Chief of the Property Damage Division. Cox testified that Gonzalez "struggl[ed] . . . to figure out how to process claims . . . timely and efficiently." Cox Dep. at 46:16-18. On September 22, 2015, Cox wrote a memorandum for his files documenting a conversation with Gonzalez in which he wrote that Gonzalez "missed the fact that the individual who filed the claim on behalf of herself had no standing to submit the claim." September 22, 2015 Memorandum, Ex. U to Mendez Decl. The Memorandum also states that Cox "warned [Gonzalez] that based on the recent requests by staff for transfers, the handling of [claim number] 2014PD036637 and the fact that he did not process over 300 settlements—that both the Assistant Comptroller and I have concerns about his performance as Chief of Property Damage." *Id.*

Reilly testified that she had "many conversations" with Gonzalez "about the process having been slowed down and that claims needed to be handled more expeditiously." Reilly Dep. at 49:16-18. Reilly further testified that "the work in the division slowed down to a crawl because of hurdles that Mr. Gonzalez was putting in the way of settling claims[.]" *Id.* at 45:14-16. In addition, "[t]he number of calls" received by the Property Division "from angry Claimants increased drastically" in part because "Gonzalez was unable to pacify Claimants when they called the Property Damage Division." *Id.* at 16:14-19. Reilly testified that "Gonzalez seemed unable . . . to make independent judgment calls" about which claims warranted further investigation and which claims should be settled quickly. *Id.* at 81:3-5. Despite the conversations between Reilly and Gonzalez about the need to resolve cases more quickly, Reilly testified the problem "was only getting worse." *Id.* at 102:10. Eventually, Cox, Reilly and Kim decided that "Gonzalez was not the right fit for" the

29

Property Damage Chief position.  *Id.* at 102:20.  Defendants' evidence of Gonzalez's poor

performance in his role as Division Chief of the Property Damage Division provides a legitimate,

non-discriminatory reason to demote Gonzalez.

Because Defendants have carried their burden, Gonzalez must show that the reason given

by Defendants for his demotion—his poor performance—was pretextual.  Gonzalez generally

disputes that his job performance was inadequate.  *See* 56.1 Stmt at 15-25.  Among other arguments,

Gonzalez asserts that he was "making the operations of [the Property Damage Division]

transparent" and "introduc[ing] other innovations to improve [the Property Damage Division]."  *Id.*

at 22.  However, a court applying anti-discrimination statutes does not "sit as a super-personnel

department that reexamines employers' judgments."  *Ya-Chen Chen v. City Univ. of New York*, 805

F.3d 59, 73 (2d Cir. 2015) (quotation omitted); *see also Shands v. Lakeland Cent. Sch. Dist.*, 771 F. App'x

121, 122-23 (2d Cir. 2019).  Employers are generally free to "establish . . . priorities and to act upon

the[ir] good faith judgments" in making personnel decisions.  *Ya-Chen Chen*, 805 F.3d at 73

(quotation and ellipsis omitted).

It is clear from Gonzalez's testimony in this case that he had substantive disagreements with

his supervisors about how the Property Damage Division should function.  Gonzalez thought it

more important to investigate claims thoroughly.  *See* Gonzalez Dep. at 75:10-77:12.  By his own

admission, Gonzalez's supervisors instructed him that he was moving cases too slowly.  *See, e.g., id.* at

77:2-4.  These disagreements over how to prioritize competing values—the thoroughness of claim

investigation versus the speed of settling claims—are not sufficient to suggest that the decision to

demote Gonzalez was pretextual.  If anything, they are evidence that the decision to demote

Gonzalez was based on the legitimate reason that Gonzalez refused to comply with instructions

from his supervisors.

Again, Gonzalez failed to argue that the order to fire Pierre itself or Maglio-Scotti's

comments suggest that Defendants' decision to demote him was pretextual, so the argument is waived. And again, the isolated nature of these remarks would be insufficient to raise an inference of retaliation. Moreover, the temporal gap between these statements and Gonzalez's demotion undermines an inference that Defendants' reasons for demoting Gonzalez were pretextual. Because Gonzalez has again failed to show both that the reasons Defendants have offered for demoting him were false and that Defendants were motivated by retaliatory animus, this is an alternative ground on which Defendants are entitled to summary judgment on Gonzalez's second claim for relief.

### c. Failure to Interview

In his third cause of action, Gonzalez alleges that the Defendants refused to interview him for the Senior Court Representative position because he exercised his First Amendment rights by filing internal complaints and refused to fire Pierre. FAC ¶ 223. Because a different framework applies to Gonzalez's First Amendment retaliation claims, the Court evaluates those claims separately.

### i. Fourteenth Amendment Retaliation Claims

As noted above, Gonzalez's refusal to fire Pierre was protected activity. In *Gonzalez I*, the Court also noted that the filing of the Internal Grievance was protected activity. 377 F. Supp. 3d at 290. In this instance, Gonzalez has at least raised an issue of fact sufficient to survive summary judgment as to whether there is a causal connection between his filing of the Internal Grievance and Defendants' failure to interview him for the Senior Court Representative position. Gonzalez filed the Internal Grievance on September 20, 2016. *See* Internal Grievance at 1. Gonzalez was not interviewed for the Senior Court Representative position in November of 2016. *See* Gonzalez's Application for Senior Court Representative at 1. Hence, Defendants' failure to interview Gonzalez occurred within three months of Gonzalez's protected activity. That is sufficient to raise an inference of a causal connection between Gonzalez's protected activity and Defendants' failure to

interview him for the Senior Court Representative position. Hence, Gonzalez has established a *prima facie* case of retaliation by Defendants.

The burden thus shifts to Defendants to offer legitimate, non-discriminatory reasons for their failure to interview Gonzalez. Defendants rely on the factual findings of ALJ Garcia in the OATH Proceeding to bolster their argument that they had legitimate, non-discriminatory reasons for failing to interview Gonzalez.

The parties dispute whether the factual findings of ALJ Garcia are entitled to preclusive effect. "The Supreme Court has held that, as a matter of federal common law issue preclusion, 'when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.'" *Locurto v. Giuliani*, 447 F.3d 159, 170 (2d Cir. 2006) (quoting *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)) (ellipsis omitted). "The state courts of New York 'give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate.'" *Id.* (quotation omitted). In addition, for issue preclusion to apply "to administrative agency findings, 'the issue sought to be precluded must be identical to a material issue necessarily decided by the administrative agency in a prior proceeding.'" *Id.* at 171 (quoting *Jeffreys v. Griffin*, 1 N.Y.3d 34, 39 (2003)).

"The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion," while "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with the party opposing the application of issue preclusion." *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quotation and citation omitted). Courts in this district have afforded preclusive effect to OATH proceedings such as those conducted by ALJ Garcia. *See, e.g.*, *Krasner v. City of New York*, 11 CIV. 2048 PGG, 2013 WL 5338558, at *11 n.9 (S.D.N.Y. Sept. 23, 2013); *Dudzik v. City of New York*,

No. 01 CIV. 2450 (NRB), 2003 WL 203226, at *8 & n.11 (S.D.N.Y. Jan. 29, 2003); *Cortez v. City of New York*, No. 99 CIV. 4304 NRB, 2001 WL 410092, at *5-6 (S.D.N.Y. Apr. 20, 2001).

ALJ Garcia's factual findings are entitled to preclusive effect. A review of the record in the OATH proceeding shows that Gonzalez had a full and fair opportunity to litigate his claims. He appeared through counsel, *see generally* OATH Tr.; received responses to this discovery requests, *see* OATH Discovery Requests; OATH Discovery Responses; made a motion to dismiss the charges against him, 9/13/17 Letter to OATH, Ex. BBB to Mendez Decl.; testified on his own behalf and presented two witnesses, OATH Tr. at 145-49, 165-256; was allowed to present evidence and object to the introduction of the state's evidence, *see generally* OATH Tr.; and was allowed to submit post-trial briefing, *see* OATH Post-Hearing Brief, Ex. CCC to Mendez Decl. The conclusion that this OATH proceeding afforded Gonzalez a full and fair opportunity to litigate his claims accords with decisions of other courts in this Circuit that have afforded preclusive effect to findings of OATH ALJs.

Gonzalez offers several arguments against this conclusion. Gonzalez first objects generally to the procedures employed at the OATH proceeding. *See, e.g.*, 56.1 Stmt at 5 (objecting that OATH does not follow the federal rules of evidence). However, as noted above, other courts in this district have afforded preclusive effect to the factual findings of OATH proceedings. Gonzalez has not argued that these cases were wrongly decided or that they are distinguishable from the present case. In any event, the standard for issue preclusion in New York courts is whether Gonzalez had a full and fair opportunity to litigate the issues that were necessarily decided in the prior action. That standard does not require a state agency to use the federal rules of evidence.

Gonzalez also argues that issue preclusion does not apply because Gonzalez did not initiate the OATH administrative proceeding. Gonzalez argues that this distinguishes the case from the Supreme Court's decision in *Elliott* because in *Elliott*, the plaintiff chose to initiate both proceedings.

33

This argument is puzzling because the Supreme Court's holding in *Elliott* did not turn on who had initiated the state administrative proceeding or the later federal court proceeding. Rather, *Elliott* held that "federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. at 799. Because New York courts do not consider which party initiated a lawsuit in deciding whether to give preclusive effect to factual findings made by an agency, it is irrelevant to the Court's determination here.

Next, Gonzalez argues that because ALJ Garcia did not enter any findings about a discrimination or retaliation, he is not precluded from submitting those arguments in this action. This argument appears to mistake issue preclusion with the related doctrine of claim preclusion.[9] "Under the doctrine of claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor*, 553 U.S. at 892 (quotation omitted). "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* (quotation omitted).

Defendants are not arguing that Gonzalez is precluded from raising a claim for discrimination or retaliation in this case. Rather, Defendants argue that certain factual findings made by ALJ Garcia are entitled to preclusive effect. Thus, even though issues that were necessarily decided by ALJ Garcia have arisen in the context of a different claim, that does not defeat Defendants' argument that issue preclusion applies in this case. For similar reasons, Gonzalez's argument that he did not have a full and fair opportunity to litigate his discrimination and retaliation claims is unavailing. It is immaterial to the doctrine of issue preclusion whether Gonzalez had an opportunity to litigate his discrimination and retaliation claims. He must only have had full and fair

---

[9] "These terms have replaced a more confusing lexicon. Claim preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008)

opportunity to contest the issues that are subject to preclusive effect.

Defendants ask the Court to accord preclusive effect to a number of ALJ Garcia's factual findings. Specifically, Defendants note that ALJ Garcia necessarily decided that Gonzalez 1) was "guilty of excessive and unauthorized absences from work encompassing approximately 288 full work days since 2016, including a failure to appear at work at all in 2017 at least through the first date of trial, a period encompassing over eight months," 2) "stopped attending work because he was upset at his demotion," 3) submitted "false statements on his timesheet and on documents related to [his] employment hiring process,"—including Gonzalez's statements on a DOI questionnaire that he was an Assistant District Attorney (ADA) in the King's County District Attorney's Office even though he had not passed the New York bar exam and therefore did not hold that title—and 4) "engaged in insubordination." Memorandum of Law in Support of Motion for Summary Judgment ("Mem."), Dkt No. 125, at 18 (quoting OATH Decision at 16-18). Defendants also ask the court to afford preclusive effect to ALJ Garcia's finding that Gonzalez' "actions in operating a personal watercraft in Florida while out on approved FMLA leave due to a purported injury suggests dishonesty and was conduct tending to bring the City or the Office of the Comptroller into disrepute and conduct prejudicial to good order and discipline in violation of Rules 3(S) and 3(R) of the Comptroller's rules." *Id.* (quoting OATH Decision at 17). Because ALJ Garcia necessarily decided these issues during the OATH proceeding, the Court must grant these factual findings preclusive effect.

Gonzalez's excessive absenteeism, his insubordination, and his false statements about his job title were legitimate, non-discriminatory reasons for Defendants to refuse to interview Gonzalez for the Senior Court Representative position. Thus, Gonzalez again bears the burden of showing that the reasons for Defendants' failure to interview him were pretextual. Gonzalez has not carried this burden. Gonzalez objects that "there is no contemporaneous document from the City or the

Comptroller's Office to show that 'excessive absenteeism' in one title is a valid bar to interviewing for another title." Opp. at 12. However, even assuming that this is true, the lack of a formal policy document stating that an employee's attendance at work is a prerequisite for a promotion does not prove that the failure to interview Gonzalez was pretextual. This is common sense, and it is reasonable for an employer to require an employee to show up for work before considering that employee for a promotion.

Gonzalez again failed to argue that the order to fire Pierre itself or Maglio-Scotti's comment about Puerto-Ricans is evidence that Defendants reasons for failing to interview him were pretextual, so the argument is again waived. Moreover, as noted above, stray remarks do not raise an inference of retaliatory intent. It is also noteworthy, though not dispositive, that Defendants failed to interview Gonzalez more than 15 months after Gonzalez testified that he first reported improprieties in the settlement practices of the Property Damage Division, Gonzalez Dep. I at 105:25-106:11, and more than two years after he refused to fire Pierre. Accordingly, Gonzalez has failed to show that Defendants reasons for firing him were false and that Defendants were motivated by retaliatory animus, as required at the third step of the *McDonnell Douglas* framework. Defendants are thus entitled to summary judgment on Gonzalez's Fourteenth Amendment retaliation claims in his third claim for relief.

### ii. First Amendment Retaliation Claims

#### A. Legal Standard

Gonzalez argues that the failure to interview him was in retaliation for his exercise of his First Amendment rights. To establish a *prima facie* case of First Amendment retaliation, "the plaintiff must first establish by a preponderance of the evidence (1) that the plaintiff's conduct at issue was constitutionally protected, and (2) that it was a substantial or motivating factor in the employment decision." *Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998) (citing *Bd. of Cty. Comm'rs, Wabaunsee*

*Cty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993)).

As discussed in *Gonzalez I*,

[i]n *Garcetti v. Ceballos*, the Supreme Court held that the inquiry into whether an individual's speech is protected by the First Amendment proceeds in two parts. First, the Court must determine whether the employee spoke as a citizen on a matter of public concern. If the answer to this initial question is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer to the first question is yes, an employer must then demonstrate that it had an adequate justification for treating the employee differently based on his or her speech from any other member of the general public.

In determining whether an employee speaks as a citizen or as an employee, the Supreme Court has held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. On the other hand, employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. Whether an employee acted in accordance with his official duties or acted as a citizen is a practical inquiry.

With respect to whether speech is a matter of public concern, a court must take into account the content, form, and context of a given statement, as revealed by the whole record and determine whether the speech arises from the speaker's status as a public citizen or from the speaker's status as a public employee. The court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it has a broader public purpose. A statement is a matter of public concern when it is of political, social, or other concern to the community. In contrast, speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern. While the employee's motive for making the statement may be one factor in determining whether it is a matter of public concern, motive is not, standing alone, dispositive or conclusive.

377 F. Supp. 3d at 293-94 (quotations, citations, and alterations omitted). Hence, to establish a *prima facie* case of First Amendment retaliation, Gonzalez must show that (i) he was speaking as a citizen rather than as an employee, (ii) he was speaking on a matter of public concern rather than on a purely private matter, (iii) he suffered an adverse employment action as a result of his speech, and (iv) his speech was causally connected to the adverse employment action. *Id.* at 294-96.

"Even if the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). The Supreme Court "articulated . . . [o]ne such defense" in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). *Anemone*, 629 F.3d at 114. Like *McDonnell Douglas*, *Mt. Healthy* established a "burden-shifting framework." *Coogan*, 134 F.3d at 484. After a plaintiff has established a *prima facie* case, "the defendant may escape liability only by proving by a preponderance of the evidence that the same employment action would have been taken absent the protected conduct." *Id.* (citing *Mt. Healthy*, 429 U.S. at 287; *White Plains Towing*, 991 F.2d at 1059); *see also Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1952 (2018) ("In terms of precepts in the law of torts, the [*Mt. Healthy*] Court held that even if retaliation might have been a substantial motive for the board's action, still there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination.") (citations omitted). "The burden is on the government to make out the defense." *Anemone*, 629 F.3d at 114 (citation omitted).

## B. Application

Gonzalez argues that Defendants retaliated against him for lodging complaints, including the Internal Grievance. The Court must first address whether Gonzalez was speaking an employee or as a citizen. In *Gonzalez I*, the Court could not determine whether "Mr. Gonzalez's complaints were part of his official duties" and thus denied Defendants' motion to dismiss. 377 F. Supp. 3d at 294.

On this motion for summary judgment, however, the Court determines that Gonzalez spoke as an employee when he lodged internal complaints with his supervisors. Speech that is "part-and-parcel of [an employee's] concerns about his ability to properly execute his duties" qualifies as speech by an employee, rather than as a citizen. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010) (quotation omitted). Gonzalez worked as a Division

Chief for the Comptroller's Office, which is the City's fiscal watchdog. That job necessarily included ensuring that settlements undertaken by the Property Damage Division complied with applicable statutes, including anti-corruption laws. Hence, Gonzalez spoke as an employee when he complained about settlement practices in the Comptroller's Office.

The context of the Internal Grievance also strongly supports this conclusion. The Second Circuit has recognized that speech in "the form of an employee grievance" has "no relevant citizen analogue" and is thus speech that is "pursuant to [an employee's] job duties." *Id.* Thus, Gonzalez's Internal Grievance was made pursuant to his job duties, and Gonzalez was speaking as an employee when he filed the Internal Grievance.[10]

Defendants are also entitled to summary judgment because they have shown that they would have failed to interview Gonzalez for the Senior Court Representative position even absent his protected speech. Under *Mt. Healthy*, assuming that Gonzalez had satisfied his initial burden to prove a *prima facie* case of First Amendment retaliation, the burden shifts back to Defendants to show that they would have failed to interview Gonzalez even in the absence of his protected speech. Defendants have met this burden for the reasons described in the previous subsection. As ALJ Garcia found, Gonzalez was excessively absent and insubordinate and lied on his DOI questionnaire. This behavior provided ample justification for Defendants to refuse to interview Gonzalez for a promotion, irrespective of his decision to file the Internal Grievance or raise other complaints about practices in the Comptroller's Office[11] Accordingly, Defendants have met their

---

[10] The parties vigorously dispute whether Gonzalez's speech was made pursuant to his listed job duties in his job description. However, "[f]ormal job descriptions bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Gonzalez I*, 377 F. Supp. 3d at 294 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006)). Hence, the Court does not find the question of whether Gonzalez's speech technically fell within his official job duties to be useful in conducting the "practical inquiry" into whether Gonzalez spoke as an employee or as a citizen. *Garcetti*, 547 U.S. at 424.

[11] Gonzalez asserts a First Amendment retaliation claim only in his third cause of action. FAC ¶ 223. However, to the extent that other causes of action in the FAC can be read to assert other claims for First Amendment retaliation, the

burden to show that they would have failed to interview Gonzalez even if he had never filed the Internal Grievance or lodged other complaints. This is an alternative ground on which Defendants are entitled to summary judgment on Gonzalez's First Amendment retaliation claim.

### d. Disciplinary Charges

Gonzalez argues that Defendants' decision to bring disciplinary charges against him before OATH was retaliatory. *See* FAC ¶¶ 227-35. In the FAC, Gonzalez alleges that Defendants decided to institute disciplinary charges against him because he filed an unlawful discrimination complaint with the DOI. *Id.* ¶ 226. Gonzalez filed the DOI Claim on January 13, 2017. *See* DOI Claim at 1. However, Defendants did not receive notice of the DOI claim until the Inspector General of DOI sent a "Complaint Referral" to Comptroller's Office General Counsel Kathryn Diaz on April 7, 2017. *See* DOI Referral at 1. Defendants served Gonzalez with a Notice of Informal Conference and Statement of Charges on February 13, 2017. *See* Disciplinary Charges at 1.

Gonzalez has not raised a *prima facie* case of retaliation because he has not shown that Defendants were aware of his protected activity. "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that . . . the employer was aware of the activity[.]" *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). Although Gonzalez filed the DOI Claim in January 2017, Defendants did not receive notice of the claim until April of 2017—two months after Defendants initiated the OATH proceeding. Thus, Gonzalez has not shown that Defendants were aware of the DOI Claim that is the alleged basis for Defendants' retaliatory action.

Defendants are also entitled to summary judgment because Gonzalez has failed to show that the legitimate, non-discriminatory reasons they offered for the decision to initiate the OATH

---

Court concludes that Defendants would be entitled to summary judgment on those claims because Defendants have shown that they would have taken the adverse employment actions about which Gonzalez complains even if he had not exercised his First Amendment rights.

Proceeding against him was pretextual. Again assuming that Gonzalez had carried his burden to prove a *prima facie* case, the burden shifts to Defendants to produce evidence that they had legitimate, non-discriminatory reasons to initiate the OATH Proceeding. For the reasons stated in the previous section, Defendants have satisfied this burden. Gonzalez's excessive absenteeism, insubordination, and the false statements on his DOI questionnaire were sufficient reason for Defendants to initiate the OATH Proceeding against Gonzalez.

Hence, the burden shifts back to Gonzalez to show that the legitimate reasons offered for Defendants' decision to initiate the OATH Proceeding against him were pretextual. He has not done so. Gonzalez failed to offer any argument on this point in his briefing. Gonzalez also failed to present any evidence that Defendants were aware of the DOI Claim when they decided to initiate the OATH Proceeding, further undermining the argument that Defendants' reasons were pretextual. Consequently, this is an alternative ground on which Defendants are entitled to summary judgment on Gonzalez's claim for retaliation based on Defendants' decision to initiate the OATH Proceeding against him.

### e. Termination

Finally, in his seventh cause of action, Gonzalez alleges that Defendants retaliated against him for filing the DOI Claim and for prosecuting this lawsuit by terminating him. FAC ¶ 262. Gonzalez was terminated on April 30, 2018. *See* Termination Letter at 1. As discussed above, Gonzalez filed the DOI claim on January 13, 2017, and the Comptrollers' Office received the DOI Referral on April 7, 2017. Gonzalez initiated this lawsuit on August 25, 2017. Dkt No. 1.

Gonzalez has failed show a causal connection between his protected activity and Defendants' decision to terminate him. Gonzalez was terminated more than one year after his last protected activity. Hence, Defendants' decision to terminate him is too remote in time to justify an inference of a causal connection between Gonzalez's protected activities and Defendants' decision

to terminate him.

Defendants are also entitled to summary judgment on this claim on the alternative ground that Gonzalez has failed to show that the legitimate and non-discriminatory reasons offered by Defendants for his termination were pretextual. Assuming *arguendo* that Gonzalez had satisfied his burden to prove a *prima facie* case of retaliation, the burden shifts back to Defendants to offer legitimate and non-discriminatory reasons for their decision to terminate Gonzalez. Defendants have satisfied that burden. As noted above, ALJ Garcia found that Gonzalez was excessively absent, insubordinate, and that he lied on a DOI questionnaire. These are legitimate and non-discriminatory reasons for Defendants to terminate Gonzalez. Indeed, ALJ Garcia recommended that the City terminate Gonzalez based on the charges in the OATH proceeding. OATH Decision at 18.

Because Defendants have articulated a legitimate reason for Gonzalez's termination, the burden shifts back to him to show that these reasons are pretextual. Again, Gonzalez has not done so. Gonzalez does not argue the point in his briefing. And the temporal gap between Gonzalez's protected activity and Defendants' decision to terminate him further undermines an inference of retaliation. Accordingly, this is an alternative ground on which Defendants are entitled to summary judgment on Gonzalez's retaliation claim related to his termination.

### C. Constructive Discharge Claim

Gonzalez asserts a claim for constructive discharge in the FAC. FAC at 46. Neither party addresses this claim in its briefing. Even assuming such a claim is actionable under Section 1983, "[a]ctual termination precludes a suit for constructive discharge." *Kurth v. Gonzales*, 469 F. Supp. 2d 415, 425 (E.D. Tex. 2006) (citing *Jordan v. City of Gary*, 396 F.3d 825, 836-37 (7th Cir. 2005); *Haselmann v. Kelly Servs., Inc.*, No. 04-3213(MLC), 2006 WL 2465420, at *17 (D.N.J. August 22, 2006)). As discussed above, Gonzalez did not quit, so he was not "constructively" discharged. He was terminated and therefore he was actually discharged. Because "constructive discharge refers to a

situation in which an employee is not fired but quits," Gonzalez cannot maintain a constructive discharge claim. *Jordan*, 396 F.3d at 837 (quotation omitted). Accordingly, Defendants are entitled to summary judgment on Gonzalez's constructive discharge claim.

### D. Supplemental Jurisdiction

The Court declines to exercise supplemental jurisdiction over Gonzalez's claims under the NYCHRL. When a district court has original jurisdiction over claims in a case, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III." *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) ("Pendent jurisdiction . . . exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority,' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" (quoting U.S. Const. art. III, § 2)). Claims are considered "'part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)).

The decision to exercise supplemental jurisdiction over a state law claim is by nature discretionary. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). Where claims satisfy the "same case or controversy" test under 28 U.S.C. § 1367(a), however, "the discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of subsection 1367(c)." *Shahriar*, 659 F.3d at 245 (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998)). Subsection 1367(c) permits a court to decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which

the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, subsection (3) applies because the Court has dismissed all of the claims over which it had original jurisdiction. Therefore, the Court may exercise its discretion to decline supplemental jurisdiction over any remaining state law claims.

Both the Second Circuit and the Supreme Court have "held that when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *Gibbs*, 383 U.S. at 726). Even "where at least one of the subsection 1367(c) factors is applicable, a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated in *Gibbs*: economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). However, "the Supreme Court has stated that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward declining jurisdiction over the remaining state-law claims.'" *In re Merrill Lynch*, 154 F.3d at 61 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This is the usual case: The Court has evaluated the values articulated in *Gibbs* in the context of this case and has concluded that they weigh in favor of the Court declining supplemental jurisdiction. Thus, the Court declines to exercise supplemental jurisdiction over Gonzalez's claims under New York law, including his claims under the NYCHRL.

**IV. CONCLUSION**

Defendants are entitled to summary judgment on all of Gonzalez's federal claims in the FAC. Therefore, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is

directed to terminate all pending motions, adjourn all remaining dates, and to close this case.

SO ORDERED.

Dated: March 4, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge